**In re INVESTIGATION BEFORE the APRIL 1975 GRAND JURY.**

**Appeal of Sol Z. ROSEN and Local 6 of The Newspaper and Graphic Communication Union.**

**No. 75–2109.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 18, 1975.

Decided Feb. 3, 1976.

Frederick H. Weisberg, Washington, D. C., with whom J. Patrick Hickey, Washington, D. C., was on the brief, for Public Defender Service as amicus curiae.

Roger A. Finzel, Washington, D. C., filed a brief on behalf of Coalition to End Grand Jury Abuse as amicus curiae.

Anthony D. Pirillo, Jr. and Salvatore J. Cucinotta, Philadelphia, Pa., filed a pro se brief as amicus curiae.

David Epstein, Washington, D. C., with whom Sol Z. Rosen, David S. Barr and William B. Peer, Washington, D. C., were on the brief, for appellants.

Carl S. Rauh, Principal Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Brian W. Shaughnessy, Robert R. Chapman and Jordan A. Luke, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and McGOWAN and ROBB, Circuit Judges.

PER CURIAM:

This case was heard on an expedited basis to review an order of the District Court (1) disqualifying Sol Z. Rosen, Esquire, from representing more than one of the over one hundred pressmen members of Local 6 of the Newspaper and Graphic Communication Union who have been or may be subpoenaed before the April 1975 Federal Grand Jury investigating the violence that occurred at the Washington Post on October 1, 1975; and (2) requiring those pressmen who wish to be represented by counsel to retain separate counsel not retained by any other subpoenaed pressman. Our review of the record leads us to conclude that the District Court lacked sufficient grounds to issue the challenged order, which we therefore vacate.[1]

I

The most recent labor contract in effect between the Washington Post Company and Local 6 expired at midnight on September 30, 1975. By 5:30 A.M. on October 1, 1975, Local 6 had declared that it was on strike, and, while more than 100 pressmen were working the early morning shift at the Post, all seventy-two printing units of the Post's nine presses were seriously dam-

aged.[2] Five days later a federal grand jury initiated a criminal investigation of the disturbances at the Post. Twenty-one pressmen who were working at the time the Post's property was damaged were subpoenaed to testify before the grand jury on October 8, 10, and 14, 1975; they were notified that at that time they were not considered targets or subjects of the grand jury investigation.

The law firm of Barr and Peer, general counsel to, and acting on behalf of, Local 6, retained Mr. Rosen to represent the members of the union before the grand jury and to advise them of their rights with respect to both the grand jury and federal law enforcement officials.[3] Mr. Rosen, whose fee was paid by the union, was of the view that he had been retained by the union "to advise the members what the proceedings were about. . . . to explain what is a subpoena, what is perjury, and also to explain to them, after talking to [the United States Attorney's office] exactly the nature of the investigation." Transcript at 3 (Argument of Mr. Rosen) (Nov. 7, 1975). It appears from the record that to accomplish those tasks Mr. Rosen gave the union members what was described at oral argument as a "lecture" concerning the privilege against self-incrimination, the obligation to testify if offered immunity, and waiver of one's constitutional rights. Mr. Rosen also gave each union member present at the lecture a sheet of paper explaining how to assert the Fifth Amendment privilege.

Apparently aware of the enormous potential for conflict of interest generated by his multiple representation of the union members under these circumstances, attorney

---

1. The record in this case consists of the Government's Motion for Separate Counsel, Mr. Rosen's written opposition to that motion, and the transcript of the oral argument before the District Court on the motion. Given the absence of sworn testimony, we take as true for the purposes of this motion the statements made in the record and in the motion papers filed with this court.

2. In addition to the damage to the Post's property, a foreman at the Post suffered injuries as a result of the violence on the premises. The Post has filed a civil suit against the union

seeking fifteen million dollars in damages. *The Washington Post Co. v. International Printing & Graphic Communication Union*, Civil No. CA 9694–75 (Super.Ct.D.C., filed Oct. 28, 1975).

3. As of November 7, 1975, attorney Rosen had not been retained to represent the union in the Post's civil suit for damages, see note 2 *supra*, but he could not assure the District Court that he would not be representing the union in that case. Transcript at 2 (Argument of Mr. Rosen) (Nov. 7, 1975). *See also* note 4 *infra*.

Rosen studiously avoided individual consultation with his clients.[4] As a result, he does not know the extent, if any, to which the twenty-one subpoenaed witnesses participated in or observed any criminal activity.

In the course of his "representation" of the subpoenaed witnesses, Mr. Rosen accompanied them to, and was present outside, the grand jury room during the questioning periods; in fact, on a number of occasions the witnesses were excused from the grand jury room to consult with Mr. Rosen. Attorney Rosen also agreed to comply with a request by Mr. Chapman of the United States Attorney's office that the latter be permitted to speak to each of the

---

**4.** We think it unlikely that the fact that the subpoenaed witnesses were informed that they were not at the time of the issuance of the subpoenas considered targets or subjects of the grand jury investigation would have influenced a careful attorney to be less vigilant in the defense of his clients' interests than if formal charges had already been filed. Consequently, an attorney retained to represent *just one* of the several witnesses would have thoroughly interviewed the client, investigated the facts relevant to his client's interests, and offered the client his professional judgment concerning the options open to the client. With the client's consent, one of those options might be to enter into negotiations with the United States Attorney whenever appropriate concerning a grant of immunity in exchange for the client's testimony. *See* American Bar Association, Standards Relating to the Defense Function §§ 3.1(a), 3.2(a), 4.1, 5.1(a), 6.1.

Attorney Rosen, however, was retained by the Union to represent the interests of *all* the subpoenaed witnesses, and as a result he found himself constrained in the actions he could take to protect the interests of his clients. *See* Transcript at 4 (Argument of Mr. Rosen) (Nov. 7, 1975). For example, if he had thoroughly interviewed each of his clients, he may well have received from witness A information that was detrimental to the interests of witness B. We agree with *amicus* Public Defender Service that under those circumstances "the attorney would be torn between advising B of the information learned from A, thereby breaching his confidential relationship with client A, or trying to advise client B as if the attorney did not know what client A told him, when he knows very well that client A's revelations should have a material impact on the attorney's recommendation to B and B's decisions and courses of action." Brief at 15. Rosen would also be precluded from recommending to any of his clients that they enter into negotiations with the United States Attorney that would prejudice the interests of his other clients.

If Mr. Rosen is representing the union as well as the subpoenaed witnesses who are members of Local 6, there is an even greater potential for conflict of interest problems. Unfortunately, we cannot discern from the record the precise nature of the relationship between attorney Rosen and Local 6; for example, attorney Rosen filed the notice of appeal in this case on behalf of himself and the union, but in papers filed with both this court and the District Court he styles himself "counsel for the witnesses." The record does indicate that the union is paying attorney Rosen's fees on behalf of the subpoenaed union members, but this fact alone does not justify a conclusion that Rosen owes a duty of legal representation to the union as well as to the subpoenaed witnesses. At a minimum, the ABA Code of Professional Responsibility obligates Rosen not to permit the union "to direct or regulate his professional judgment" in rendering legal services to the witnesses. DR 5–107(B); *see* Standards Relating to the Defense Function, *supra*, at § 3.5(c).

In any event, if Rosen is representing both the union and the subpoenaed witnesses, he runs the risk of conflicting interests in addition to those involved solely in multiple representation of the witnesses, especially given the Post's civil suit against the union, *see* note 2 *supra*. For example, it is possible that thorough questioning of the witnesses by Rosen might indicate that the witnesses were marginal participants who would testify, in exchange for immunity, that the violence was actually union sponsored. Cooperation in such circumstances with the United States Attorney would be in the interests of one set of clients—those witnesses willing to testify—but clearly not in the best interests of the union. Given the limited information in the record before us, we cannot say that such conflicts do exist, but the potential is certainly there.

As noted in text, attorney Rosen apparently concluded that the most appropriate response to these potential conflicts of interest was simply not to talk to his "clients" individually, a decision which has a tremendous impact on the quality of representation his clients are apt to receive. Of course, it was incumbent upon attorney Rosen, if he was acting as the personal legal representative of these subpoenaed witnesses, to inform them of these conflicts of interest. *See* Standards Relating to the Defense Function, *supra*, at § 3.5; American Bar Association Code of Professional Responsibility, DR 5–105(c). The record indicates that Mr. Rosen claims that he told his clients something about his conflict of interest, but the record fails to disclose the details of that communication. Transcript at 9 (Argument of Mr. Rosen) (Nov. 7, 1975).

witnesses separately in his office. Again apparently aware of the potential for conflict of interest, attorney Rosen decided to remain outside Mr. Chapman's office while the witnesses were being questioned. As before the grand jury, on a number of occasions witnesses interrupted their sessions in Mr. Chapman's office to consult with Mr. Rosen.

Of the twenty-one witnesses subpoenaed before the grand jury, two testified that they had not seen anything, and the other nineteen invoked the privilege against self-incrimination. Many of the witnesses asserted that privilege to questions concerning age, marital status, number of children, name of parents, and relationship with their attorney.[5]

## II

The United States Attorney's office, concerned with the effect of these assertions of privilege on the ability of the grand jury to function effectively, filed with the District Court on October 21, 1975 a "Motion for Separate Counsel for Grand Jury Witnesses." The Government argued in that motion (1) that the pressmen were making "blind, indiscriminate and legally unwarranted assertions" of the Fifth Amendment privilege; (2) that the pressmen were not "receiving and indeed cannot receive effective assistance of counsel where they are all represented by one lawyer who has a blatant conflict of interest;" and (3) that "[a]s a result, the efforts of the grand jury to ascertain the truth . . . are being obstructed." Motion at 4. Attorney Rosen filed his opposition to the Government's motion on November 6, 1975. After hearing the arguments on this motion on November 7, 1975, the District Court issued the challenged order on November 13, 1975. In a memorandum explaining its decision the

District Court found that the witnesses had a Sixth Amendment right to counsel at this stage of the grand jury proceedings, and a First Amendment right to associate for the purpose of retaining legal representation, but that balanced against those interests was the public interest in the effective functioning of the grand jury. Reasoning that the impairment of the pressmen's Sixth Amendment interest as a result of the order was minimal in that each witness "retains the right to choose from a limitless pool of qualified attorneys," and that the intrusion on their First Amendment interests was minimal in that "[i]t is only for this single criminal proceeding that the pressmen are unable jointly to retain counsel," the court concluded that these "minimal and temporary" impairments were justified by the need for "the grand jury, now at a standstill, to proceed with its investigation full force and with no fear of compromising the secrecy of its proceedings."

On the following day, attorney Rosen filed with the District Court on behalf of himself and Local 6 both a notice of appeal and a motion for stay of the District Court's order pending appeal. The motion for a stay was denied that same day, and Mr. Rosen consequently filed with this court on November 15, 1975 another motion for a stay pending appeal. On November 17, 1975 a panel of this court entered a ten day stay "to permit the United States Attorney to consider the granting of immunity to certain witnesses subpoenaed ·before the grand jury, and for such witnesses if they be so advised to retain other counsel." The following day the Government filed a "Motion to Vacate Ten Day Stay" on the ground that the United States Attorney was not prepared at that time "to make blind selections of random witnesses for possible grants of immunity."[6] Motion at

5. In light of the refusal of the subpoenaed witnesses to testify as to the events at the Post on the evening of the destruction of the presses, a subpoena was issued for Mr. James Dugan, President of Local 6. Mr. Dugan appeared before the Grand Jury on October 17, 1975, and, according to the Government's Motion for Separate Counsel, he was represented by Mr. Rosen. Mr. Dugan also claimed the Fifth Amendment privilege with respect to questions concerning age, marital status, and similar matters.

6. The Government decided not to question nine other pressmen who were subpoenaed to testify before the grand jury on November 17, 1975,

7. Later that day, on consideration of the Government's motion, the original panel extended the stay pending further order of this court, referred the appeal to a merits panel for expedited consideration, and appointed the Public Defender Service to file a brief and participate in oral argument as *amicus curiae.* Having considered the briefs and arguments,[7] we reach the conclusions set forth below.[8]

## III

The parties assert that this appeal presents as ripe for decision serious ques-

a date falling within this court's ten day stay. Motion to Vacate Ten Day Stay, at 7–8 n. 3.

7. *Amicus curiae* briefs were also filed by the Coalition to End Grand Jury Abuse and by Messrs. Pirillo and Cucinotta, of the Pennsylvania Bar.

8. Preliminarily, we must confront the question of appellate jurisdiction to review an order of the District Court granting a motion to require separate counsel in the course of its supervision of federal grand jury proceedings. We begin our analysis of whether that order is a final judgment for purposes of appellate jurisdiction by noting that the motion for separate counsel is in effect a motion to disqualify attorney Rosen. True, the District Court's order granting the motion did not completely disqualify attorney Rosen, but the grant of the motion did expressly disqualify him from representing more than one subpoenaed witness.

In the context of a trial rather than a grand jury proceeding, it has been held that an order *granting* a motion to disqualify counsel is a final judgment under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *E. g., Hull v. Celanese Corp.,* 513 F.2d 568, 570–71 (2d Cir. 1975); *Draganescu v. First Nat'l Bank,* 502 F.2d 550, 551 (5th Cir. 1974); *Richardson v. Hamilton Int'l Corp.,* 469 F.2d 1382, 1383 n. 1 (3d Cir. 1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973); *United States v. Hankish,* 462 F.2d 316, 318 (4th Cir. 1972) (dictum); *Brown v. Miller,* 52 U.S.App.D.C. 330, 286 F. 994 (1923) (attorney himself appeals; jurisdiction assumed without discussion). In fact, although there was originally some authority for the view that orders denying a motion for disqualification were not appealable under *Cohen, e. g., Fleischer v. Phillips,* 264 F.2d 515, 516–17 (2d Cir.), *cert. denied sub nom., Fleischer v. Benjamin,* 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959); *Marco v. Dulles,* 268 F.2d 192, 193 (2d Cir. 1959), the weight of recent authority *is* definitely in the direction of treating the denial of such motions as final orders, *e. g., Yablonski v. UMW,* 147 U.S.App.D.C. 193, 454 F.2d 1036, 1038 & n. 9 (1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972) (order denying motion for disqualification appealable where the disqualification was predicated upon ethical considerations and "additionally upon significant impingement on a specific legisla-

tive policy"); *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 496 F.2d 800 (2d Cir. 1974) (en banc) (reviewing the cases); *Ceramco, Inc. v. Lee Pharmaceuticals,* 510 F.2d 268, 270–71 (2d Cir. 1975) (*citing Silver Chrysler Plymouth, supra*); *Kroungold v. Triester,* 521 F.2d 763, 765 (3d Cir. 1975); *American Roller Co. v. Budinger,* 513 F.2d 982, 983 (3d Cir. 1975); *Greene v. Singer Co.,* 509 F.2d 750, 751 (3d Cir. 1971); *United States v. Garcia,* 517 F.2d 272, 275 (5th Cir. 1975) (criminal trial); *Uniweld Prods., Inc. v. Union Carbide Corp.,,* 385 F.2d 992, 994 (5th Cir. 1967), *cert. denied,* 390 U.S. 921, 88 S.Ct. 853, 19 L.Ed.2d 980 (1968); *Tomlinson v. Florida Iron & Metal, Inc.,* 291 F.2d 333, 334 (5th Cir. 1961) (order denying *motion for disqualification is final where* "harm resulting therefrom is in the nature of the frustration of a public policy which cannot be avoided or mitigated by any appeal taken after the trial"); *Fullmer v. Harper,* 517 F.2d 20, 21 (10th Cir. 1975). *But see Cord v. Smith,* 338 F.2d 516, 521 (9th Cir. 1964).

We find ourselves in agreement with those cases holding that an order granting a motion for disqualification is appealable, and it is our view that the factors justifying that conclusion in the trial context are equally applicable to grand jury proceedings. Indeed, even if we were to conclude that the question of appealability was closer than we think it to be, we would be disposed to take a more expansive approach to the collateral order doctrine in the grand jury context than in the trial context since allowing such appeals is less likely to involve "the mischief of economic waste and of delayed justice," *Radio Station WOW, Inc. v. Johnson,* 326 U.S. 120, 124, 65 S.Ct. 1475, 1478, 89 L.Ed. 2092 (1945). *Cf. United States v. Wilson,* 421 U.S. 309, 318, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975), in which Chief Justice Burger, writing for the Court, had an opportunity to compare trials and grand jury proceedings in terms of the obstruction that would be caused by requiring Rule 42(b) criminal contempt hearings for refusal to testify: "A grand jury ordinarily deals with many inquiries and cases at one time, and it can rather easily suspend action on any one, and turn to another while proceedings under Rule 42(b) are completed. . . . Trial courts, on the contrary, cannot be expected to dart from case to case any time a witness who has been granted immunity decides not to answer questions."

tions concerning both the nature of the rights of subpoenaed witnesses to the counsel of their choice at the pre-indictment stage of a grand jury proceeding and the need for an effective grand jury.[9] The Government argues that the appropriate approach for this court to take with respect to the issue of multiple representation is to balance the public interest in an effective grand jury against the rights of the witnesses to the counsel of their choice, rights which the Government considers to be of less than constitutional dimension. Appellants Rosen and Local 6, on the other hand, would have us rule that it was improper for the District Court to balance an "unnamed constitutional right" of the Government to "have an easy time before the grand jury" against the "constitutional" rights of the witnesses to the counsel of their choice.[10] Having considered the record as well as the briefs, however, we are not persuaded that this appeal presents an opportunity for us to pass on the merits of those questions.[11]

9. *Amicus* Public Defender Service, however, has urged upon us the view that the record in this case "is inadequate in a number of respects to resolve the novel and complex issues presented by this case. . . ." Brief at 4.

10. Attorney Rosen certainly has standing to challenge this order of the District Court. In the first place, the order at issue is directed at attorney Rosen; he is specifically ordered to limit his representation to only one of the subpoenaed witnesses, and he consequently is adversely affected by the order. Moreover, we think he has standing to assert the interests of the subpoenaed witnesses he claims to represent. *See Griswold v. Connecticut*, 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (The rights [of third parties], pressed here, are likely to be diluted or adversely affected unless those rights are considered in a suit involving those who have this kind of confidential relation to them."); Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv.L.Rev. 423, 431–33 (1974).

11. We note that the Pennsylvania Supreme Court has recently confronted these questions in the context of a petition for a writ of prohibition to a judge supervising a state grand jury who had disqualified two attorneys from representing twelve policemen subpoenaed to testify before the grand jury. *Pirillo v. Takiff*, 341 A.2d 896 (Pa.1975), *appeal dismissed and cert. denied*, 44 U.S.L.W. 3424 (U.S. Jan. 26, 1976) (No. 75–525). The supervising judge, whose order had not only disqualified the attorneys but also required the witnesses to retain separate and exclusive counsel, reasoned that (1) the conflict of interest inherent in the attorneys' multiple representation interfered with the rights of the witnesses to effective counsel, (2) the particular fee arrangement between the attorneys and the policemen's "union" (Fraternal Order of Police) would interfere with the functioning of the grand jury and would jeopardize the rights of the witness to effective counsel, and (3) the fact of multiple representation posed a serious detriment to the investigative function of the grand jury since the "Special Prosecutor could not convince counsel to elicit cooperation of one witness since such cooperation might seriously implicate the attorneys' other clients in illegal activity." *Id.* at 899.

The Pennsylvania Supreme Court expressly disclaimed reliance on the supervising judge's argument that multiple representation interfered with the Sixth Amendment right of the witnesses to effective counsel since the twelve policemen had been advised of the potential conflicts and had nevertheless chosen to continue the multiple representation. In upholding the supervising judge's disqualification of the two attorneys, the Court pursued a balancing approach, weighing on one side the state's interest impaired by multiple representation and the particular fee arrangement, and on the other the witnesses' First and Sixth Amendment interests and the interests of the attorneys in pursuing their occupation. The court concluded that "the degree of infringement resulting from the supervising judge's order is the minimum necessary to insure the state interests while at the same time the infringement is justified by the extent of the scope of the state interests and the extent of harm which is sought to be prevented." *Id.* at 906.

The Court seems to have been influenced considerably by the nature of the fee arrangement that the attorneys had with the policemen's union. The Court found on the basis of the testimony of the attorneys that as a result of the fee arrangement the attorneys would not on their own raise the subject of cooperation with the grand jury with any of the witnesses, and moreover that they would withdraw as counsel for any witness who indicated that he would consider cooperation and advise that witness to retain other counsel. *Id.* at 904. Concluding that this fee arrangement deprived the witnesses of their right to the full and complete loyalty of their attorney, the Court was willing to uphold that portion of the supervising judge's order requiring the witnesses to retain counsel unrelated to the Fraternal Order of Police. *Id.* at 904, 906.

As to the portion of the supervising judge's order requiring the witnesses to retain separate and exclusive counsel, the Supreme Court's opinion relies, erroneously we think, on the

At the outset, we think it essential to emphasize how little we can discern from the record as to the precise nature of the asserted conflicting interests. The record makes it clear that attorney Rosen, the United States Attorney, and the District Court consider Mr. Rosen to be acting in a representative capacity on behalf of the subpoenaed witnesses. And the record also shows that attorney Rosen, the Government, and the District Court are aware of the potential conflicts of interest inherent in Mr. Rosen's multiple representation of those witnesses. But what is strikingly absent from the record is any indication of the views of the individual witnesses with respect to their legal representation. There is no testimony or other evidence in the record indicating which of the subpoenaed witnesses consider Mr. Rosen to be their personal legal representative; how the witnesses would characterize the nature of their attorney-client relationship with Mr. Rosen; whether they are personally aware of the potential conflicts of interest inherent in Mr. Rosen's multiple representation; whether given such conflicts of interest they would still prefer to be represented by Mr. Rosen rather than another attorney; and, finally, whether they would expect to continue to assert the privilege against self-incrimination even if, denied Mr. Rosen's services, they elected to dispose with counsel entirely or to retain separate and exclusive counsel.[12]

The primary thrust of the Government's position on this appeal is that Mr. Rosen's failure to interview his clients thoroughly, albeit prompted by ethical considerations, has obstructed the functioning of the grand jury in that the witnesses are making "legally unwarranted" assertions of the Fifth Amendment privilege and are unable to discuss with the prosecutor through their attorney the possibility of formal or informal immunity in exchange for testimony. In light of this position, the responses of the witnesses to questions such as those listed above would be highly relevant to a determination of the existence as well as the scope of the actual controversy between the Government and Rosen and the witnesses. It may well be, for example, that the subpoenaed witnesses in this case do not view Mr. Rosen as their personal legal representative, but rather as a legal consultant retained *by the union* both to instruct them with respect to the protection afforded by the Fifth Amendment and to be on hand outside the grand jury room in the event they have any general questions on that matter; and the individual subpoenaed witnesses may also have no intention of retaining personal legal representatives to investigate the particulars of their involvement, to offer qualified legal advice with respect to their assertion of the privilege and their available options, or to negotiate on their behalf with the United States Attorney. If that eventually proved to be the situation,

view that that "portion of the order is essential to secure the secrecy of the grand jury proceeding." *Id.* at 906. We particularly note this reasoning in light of the fact that the District Court in this case, which was aware of the *Pirillo* opinion, also reasoned that multiple representation "must inevitably lead to a breach of secrecy of the grand jury proceedings." At least with respect to federal grand juries, there is no general obligation on the part of a grand jury witness to refrain from disclosing the contents of his testimony before the grand jury. Fed.R.Crim.P. 6(e); *e. g., In re Grand Jury Summoned October 12, 1970,* 321 F.Supp. 238, 240 (N.D.Ohio 1970); *In re Russo,* 53 F.R.D. 564, 570 (D.C.Cal.1971). Each of the subpoenaed pressmen below was free to disclose his testimony not only to Mr. Rosen, but also to the other pressmen and anyone else. Of course, a witness is also free to disclose his

testimony to a particular person on the condition that the latter not disclose the testimony to anyone else. Enforcement of that condition rests, however, with the witness and not with the state.

The District Court in this case was concerned that Mr. Rosen "ethically would be compelled to inform other clients of [one witness's] testimony if detrimental to them." Mr. Rosen, as noted earlier, has avoided that problem by keeping himself unacquainted with each witness's version of the events at the Post.

12. Counsel for appellant Rosen and Local 6 conceded at oral argument that there is no evidence in the record indicating what the witnesses think their relationship is with respect to Mr. Rosen, and furthermore that the witnesses were never asked whether they wanted this type of "representation."

the separate representation issue would be moot, and a ruling on our part with respect to the validity of the District Court's order requiring the retention of separate counsel would be an advisory opinion.

■ These problems with the record might have been avoided had the Government pursued the traditional method of dealing with witnesses who make "blind, indiscriminate and legally unwarranted assertions" of the privilege against self-incrimination. The Government could have brought each witness before the District Court for a ruling with respect to whether the privilege was properly asserted. The District Court can order the witnesses to answer particular questions only if it is " 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have such tendency' to incriminate." Hoffman v. United States, 341 U.S. 479, 488, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), citing Temple v. Commonwealth, 75 Va. 892, 898 (1881) (emphasis in original). A witness who continues to refuse to respond after being ordered by the court to answer grand jury questions found not to implicate the privilege against self-incrimination subjects himself to sanctions of civil and criminal contempt.[13]

At a hearing determining the applicability of the privilege to particular questions asked by the grand jury, the District Court would certainly be free to inform itself about the Government's allegations of conflicts of interest and inadequate representation by inquiring whether the witness was represented by Mr. Rosen, whether the witness was aware of the limitation on Mr. Rosen's ability to negotiate immunity in exchange for testimony, whether given that limitation the witness would prefer counsel other than Mr. Rosen, and whether the witness proposed to continue to assert the privilege under all circumstances.

■ This familiar and established procedure was available to the Government when it found itself confronted with "legally unwarranted" assertions of the privilege against self-incrimination. A motion for separate counsel is a novel and, we believe, inappropriate response at such an early stage in the grand jury proceeding. If the Government had instead sought judicial rulings with respect to the "legally unwarranted" assertions of the privilege, the present controversy might have been eased if not eliminated. In the first place, the District Court might have ordered the subpoenaed witnesses to answer some questions (such as those concerning age and marital status) as to which the Government believes the witnesses have no right to assert the privilege. Moreover, upon questioning the witnesses with respect to their relationship with Mr. Rosen and their awareness of his potential conflicts of interests, the District Court might have discovered that some of the witnesses were desirous of having separate counsel advise them with respect to an intelligent exercise of the privilege and to confer with the United States Attorney on their behalf. In any event, we can find no justification in the circumstances of this case for the substitution of a motion for separate counsel for utilization of the traditional procedure.

---

13. The District Court has power to find criminal contempt on the part of a grand jury witness for refusing to obey a court order requiring him to testify. E. g., Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965) (holding Fed.R.Crim.P. 42(b) applicable to such criminal contempt proceedings for refusals to testify before the grand jury). Of course, "the trial judge [should] first consider the feasibility of coercing testimony through the imposition of civil contempt. The judge should resort to criminal sanctions only after he determines, for good reason, that the civil remedy would be inappropriate." Shillita-

ni v. United States, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 n. 9 (1966). Congress has recently provided specific statutory authority for the imposition of civil contempt for refusals to obey court orders requiring a witness to testify before the grand jury. 28 U.S.C. § 1826. Section 1826 was intended merely to codify existing civil contempt procedures for recalcitrant witnesses in court and grand jury proceedings. S.Rep. No. 91–617, 91st Cong., 2d Sess. 33, 57 (1969); H.R. Rep. No. 91–1549, 91st Cong., 2d Sess. 33, 46 (1970), U.S.Code Cong. & Admin.News 1970, p. 4007.

Of course, we do not mean to imply that the procedure outlined above will inevitably lead to cooperation of the witnesses with the grand jury. That procedure will give the Government an opportunity to substantiate its claim that the assertions of privilege are invalid, but the District Court, applying the standard of *Hoffman v. United States, supra,* in the case of witnesses who were in the pressroom at the time the vandalizing acts occurred, may have no basis for denying assertions of privilege once the questioning has passed beyond the purely formal stage. By enactment of Congress, the United States Attorney retains the option, if he finds it to be in the public interest, of offering statutory immunity to those witnesses who have validly asserted the Fifth Amendment privilege. 18 U.S.C. §§ 6002, 6003. Once offered immunity, the witnesses cannot refuse to answer on the basis of the privilege against self-incrimination. *Id.* § 6002. It seems to us that the circumstances of this case present precisely the type of situation for which Congress intended to provide the Government with an effective tool for discovering the truth without risking violations of the Constitution in the delicate areas of freedom of association and representation by counsel of one's choice. As the Second Circuit has recently observed, "[t]he accommodation between the right of the Government to compel testimony, on the one hand, and the constitutional privilege to remain silent, on the other, is the immunity statute." *United States v. Tramunti,* 500 F.2d 1334, 1342, *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). Until accommodation in that manner has been demonstrated to be not feasible or contrary to the public interest,[14] it is surely premature to seek it through disqualification of counsel whose

advice to his clients the Government does not like.

The order is therefore vacated.

*It is so ordered.*

---

14. As noted earlier, the Government has argued that grants of immunity are not feasible at this time in that the United States Attorney would be forced "to make blind selections of random witnesses for possible grants of immunity." It became apparent at oral argument, however, that the Government is of the view that the subpoenaed witnesses participated only marginally, if at all, in the alleged criminal activity. Nor are we willing to give much

weight to the Government's concern that in granting immunity it will subject itself in subsequent trials to a cautionary instruction concerning the testimony of immunized witnesses, *see United States v. Leonard,* 161 U.S.App.D.C. 36, 494 F.2d 955 (1974), especially in light of the fact that a cautionary instruction will be required in any event for those immunized witnesses who are accomplices.