**In re Ellen BROGNA, Appellant.**

No. 78–1458.

United States Court of Appeals, First Circuit.

Argued Nov. 6, 1978.
Decided Dec. 12, 1978.

Albert F. Cullen, Jr., Boston, Mass., with whom Cullen & Wall, Boston, Mass., was on brief, for appellant.

Jeremiah T. O'Sullivan, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for the United States.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal is from the district court's order adjudging a grand jury witness, Ellen Brogna, in contempt for refusal to answer questions put to her. 28 U.S.C. § 1826. Brogna asserts on appeal that her refusal was lawful in that (1) she had properly asserted the fifth amendment privilege against self-incrimination and (2) had received an inadequate response from the government to her claim of electronic surveillance.

### 1. *Privilege against self-incrimination*

The district court ruled that Brogna did not establish that answering the questions would tend to incriminate her. The issue before us is the correctness of that ruling.

Brogna was subpoenaed to testify before the Grand Jury in connection with its investigation of possible violations of federal criminal laws involving sports bribery. 18 U.S.C. § 224 and § 1961 *et seq.* While not granted immunity, she was told she was not a "target" and that the government did not intend to indict her. She was also told that the Grand Jury was inquiring into a nationwide race-fixing scheme involving Anthony Cuilla, Howard T. Winter, and others. The questions to which she pleaded the fifth amendment were whether she knew Howard T. Winter, whether from 1973 to 1975 she had a telephone number 625–0978, whether she resided for any portion of that period at 32 Marshall Street, Somerville, Massachusetts, and whether during that period, Howard T. Winter, John Martorano, or any of their associates received telephone calls at the phone that was in her home at 32 Marshall Street, Somerville, Massachusetts, and, if so, who and when.[1]

A district court hearing was held to determine the bona fides of Brogna's fifth amendment claim. At the hearing the Assistant United States Attorney, Mr. O'Sullivan, represented that the government had evidence that "Howard Winter and some of his associates, whom the witness [Brogna], we allege knows, did receive certain telephone calls at certain times at her phone . . . ." Mr. O'Sullivan continued,

"The grand jury would like evidence regarding the fact that while Mr. Winter was not the resident of Miss Brogna's premises, that he was there on occasion and did receive telephone calls at her phone; and the questions in the grand jury transcript are about as far as the government wants to go . . . .. We don't intend to ask her the substance of any telephone conversations, or anything of that nature."

Mr. O'Sullivan said that Brogna's responses were sought to corroborate Cuilla's testimony that Winter, who allegedly controlled the nationwide horserace-fixing scheme, had been in daily telephone contact with Cuilla, giving him directions and discussing the details of the illegal operation.

Brogna's counsel, without objection or correction by the Assistant United States Attorney, amplified O'Sullivan's description as follows:

"In these particular circumstances, the government has alleged and I have been told in fact, the targets of the grand jury are . . . Winter, who allegedly is friendly and knows Miss Brogna; the other, one John Martorano, who allegedly is friendly too and knows Miss Brogna.

"They say that Howard Winter and Mr. Martorano have used a telephone that the government says is in Miss Brogna's home and that she obviously has seen them use the telephone; just from the nature of the questions asked, is that that telephone was used for illegal purposes . . . some horse-race-fixing scheme."

Brogna's counsel then went on to argue that if Brogna acknowledged overhearing Winter and Martorano using her phone for gambling purposes or overhearing something illegal being discussed, she could possibly incriminate herself as an aider and abettor or for misprision of a felony, or under "thousands of state gaming laws."

The government argued, however, that before the court could accept Brogna's fifth amendment claim she must make a further in camera proffer, presumably going beyond the facts so far brought out, to show in what way her testimony would be incriminatory. Brogna responded through her counsel that no such proffer was needed because it was obvious, from the facts already stated, that the claim was justified.

The district court sided with the government about the need for an in camera proffer, and held a closed session which Brogna

---

1. The government indicated throughout these proceedings that the telephone number 625– 0978 is listed to Brogna and that 32 Marshall Street, Somerville, is believed to be her home.

and her attorney reluctantly attended. The judge and his stenographer were the only others present. Following this meeting, the court announced its finding that a truthful answer to the questions would not tend to incriminate the witness, also stating,

> "there is nothing on the surface of this matter, such as the witness being a leading subject of investigation or having a substantial criminal record, or any other surface indicia, that would enable the court to rule in favor of the witness's position under the Fifth Amendment, absent an in camera conference such as was just held.[2]

█ We hold that the court erred in declining to accept Brogna's claim of privilege. In particular, we believe, contrary to the district court, that "the surface of this matter" was instinct with the likelihood that her answers would tend to incriminate her notwithstanding that she was not a target or a person with an evident criminal record.[3]

█ The privilege against self-incrimination extends not only to answers that would in themselves support a conviction but "likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). Since *Hoffman*, it has become clear that the claim of privilege may be based on the fear of state as well as federal prosecutions. *Malloy v. Hogan*, 378 U.S. 1, 11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). It does not require extended analysis to show that if Brogna acknowledges that the alleged ringleader in a nationwide criminal syndicate has been frequently[4] conversing from her home over the telephone, in conversations otherwise proven to have been

with criminal associates, and for criminal purposes, she is furnishing a link in a chain of evidence that could be used to prosecute her for both federal and state crimes. Her furnishing of her telephone and apartment on a regular basis to highly-placed operatives of organized crime could, with little more, give rise to an inference of knowing participation as an aider and abettor, or co-conspirator, in the violation of federal or state gaming laws.

█ It is, of course, for the court, not the witness, to decide whether there is a genuine rather than a spurious danger of self-incrimination. *Hoffman*, 341 U.S. at 486, 71 S.Ct. 814, 818. If it "clearly" appears to the court that the witness is "mistaken" or is advancing his or her claim as a subterfuge, the court should compel the witness to answer. *Id.* The privilege against self-incrimination must, however, "be accorded liberal construction in favor of the right it was intended to secure." *Id.* Here the government's own evidence, indicating that leading underworld figures may have conducted their illegal business from her home over an extended period, and the questions themselves, asking Brogna in effect to confirm that fact, satisfied Brogna's burden. We believe the court should have sustained her claim without more.

█ The government's contrary argument, which relies heavily on the old case of *Mason v. United States*, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198 (1917), urges an approach inconsistent with *Hoffman* and all the cases that have followed it. The grand jury has, of course, a right to compel testimony, but it cannot be seriously contended that that right either overshadows or weakens the fifth amendment privilege. Fortunately for the government, immunity stat-

**2.** Without revealing any confidences, we can say from our own review of the transcript of the in camera conference that it added nothing material to the facts that were already known. Nor, we may add, did it subtract anything.

**3.** Our conclusion in this regard is drawn solely from the information that was before the district court. Materials such as the Sports Illustrated article mentioned in Brogna's appellate

brief, not having been presented to the district court, play no part in our determination. *New Haven Inclusion Cases*, 399 U.S. 392, 450 n. 66, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

**4.** Mr. O'Sullivan represented that Cuilla testified that he reported "daily" to Winter by phone. The questions put to Brogna covered activities during the period 1973–75.

utes are available to relieve it from the bind that might occur in situations such as this. None of the cited post-*Hoffman* cases seem to us to come close to permitting the enforcement of testimony from one in so potentially compromising or compromised a position as Brogna. While in *United States v. Mandujano*, 425 U.S. 564, 573, 96 S.Ct. 1768, 1775, 48 L.Ed.2d 212 (1976), the Court recognized that a witness, though possibly engaged in some criminal enterprise can be required to answer before a grand jury, this assertion is qualified by the remark, "so long as there is no compulsion to answer questions that are self-incriminating." For Brogna to acknowledge not only ownership of the phone and apartment but knowledge of the presence therein of Winter and his criminal associates and the making of calls which the government says involved criminal activity, forces her to concede that she was in the center, physically at least, of the very criminal activity under investigation. If her affirmative answers would fall short of fully establishing conscious complicity, they would not fall short by much.

■ The government was also incorrect in thinking that an in camera hearing was required in this case. Whatever the uses of an in camera hearing, one is not required if the external circumstances support the privilege claim;[5] a refusal to furnish additional evidence at such a hearing is not a reason for denying the privilege if the claim is otherwise supported. In *Hoffman*, the Supreme Court said,

"[I]f the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very

protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."

341 U.S. at 486–87, 71 S.Ct. at 818.

■ It is unimportant, moreover, that Brogna was not a "target" of the investigation. *United States v. Washington*, 431 U.S. 181, 189, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977); see *In Re Investigation Before The April 1975 Grand Jury*, 174 U.S.App.D.C. 268, 271, 531 F.2d 600, 603 n. 4 (1976). The prosecutor's denial of a present intention to prosecute her neither protected her against state gaming prosecutions nor could be counted on to bind the federal government, at least in such a way as to provide the encompassing immunity required to negate a claim of privilege. *United States v. Johnson*, 488 F.2d 1206, 1209, n. 2 (1st Cir. 1973). If the government feels that her testimony is worth it, and lacks any interest in prosecuting her, it can grant her immunity. *In Re Investigation Before The April 1975 Grand Jury*, 174 U.S.App.D.C. at 277, 531 F.2d at 609.

We hold that under the fifth amendment Brogna was privileged to refuse to respond to the questions put to her.

2. *Claim of Electronic Surveillance*

■ Brogna also made a claim of illegal electronic surveillance, alleging there had been strange noises and voices on her telephone line.[6] The government, as required under 18 U.S.C. § 3504, see *Gelbard v. Unit-*

5. A proper use for an in camera hearing is to allow a witness to impart sufficient facts in confidence to the judge to verify the privilege claim where external circumstances do not afford adequate verification. In such a case, the judge is simply providing the most favorable setting possible for the witness to "open the door a crack" where there is no other way for the witness to verify his claim. If, on the other hand, the court refuses to acknowledge the privilege and insists on in camera verification from the lips of the witness even though rea-

sonable grounds for claiming the privilege appear in the surrounding circumstances, the court comes perilously close to doing what the fifth amendment forbids.

6. We treat the electronic surveillance claim notwithstanding our ruling that Brogna is privileged under the fifth amendment because of the possibility that the surveillance claim may arise in the future—if, for example, the government should immunize her.

*ed States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), filed responsive affidavits furnished by Mr. O'Sullivan and Special F.B.I. Agent Daley, the Assistant United States Attorney and Agent, respectively, in charge of the investigation. Both denied knowledge of any interceptions of Brogna or of her premises or of telephone number 625–0978 listed to her. These denials were said to be based on a check of Department of Justice and F.B.I. files as well as, in O'Sullivan's case, upon his familiarity with the investigation. O'Sullivan also swore that, from his own knowledge, all questions propounded to Brogna were based exclusively on information provided by Cuilla, a cooperating witness, and telephone toll records. He concluded,

> "On the basis of my inquiries and from my own personal knowledge I hereby state that:
>> a. The questions that have been propounded to ELLEN BROGNA are not the product of electronic surveillance.
>> b. Further, these questions are in no way based upon the exploitation of any electronic surveillance."

We think the government's affidavits were adequate to discharge its duty. To be sure, the government indicated that the investigation had been assisted by the New Jersey and the Pennsylvania State Police, yet made no mention that the records of those agencies had been searched, with negative results, as had the Department of Justice's and F.B.I.'s. On the other hand, Mr. O'Sullivan declared his own familiarity, from the inception, with the investigation, and both stated the sources of the question put to Brogna and negatived the existence of any other source, including electronic surveillance. More is not required in these circumstances. *In Re Quinn,* 525 F.2d 222, 226 (1st Cir. 1975). *See United States v. Grusse,* 515 F.2d 157, 158–59 (2d Cir. 1975) (Lumbard, J., concurring). This is not to say that in different circumstances the federal authorities might not be required to inquire of a cooperating state agency; here, however, the affidavits credibly establish, from the first hand knowledge of the Assistant United States Attorney who showed

that he was situated to know, that the subject questions could not have been tainted by information from New Jersey or Pennsylvania police sources.

Thus while Brogna's fifth amendment claim is upheld, and she is therefore relieved from answering on that ground, we reject her electronic surveillance claim as an independent basis for her refusal to respond.

*The adjudication of contempt is reversed.*