563 F.2d 652
 In re INVESTIGATION BEFORE the FEBRUARY, 1977, LYNCHBURG GRAND JURY.
UNITED STATES of America, Appellee,
v.
Thomas James BARKER, Betty Scearce Childress, Phyllis June
Nunley, Tencha Williamson, Herbert Owen Boyd, Harold Wayne
Dowdy, Aubrey Henderson, Wayne Holley, Charles James
Royster, Jo Ann Meadows, Appellants.
 No. 77-1497.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1977.
Decided Oct. 6, 1977.
 
 David Epstein, Washington, D.C. (Berry, Epstein & Sandstrom, Sol Z. Rosen, Washington, D.C., on brief), for appellants.
 Paul R. Thomson, Jr., U.S. Atty., Roanoke, Va. (E. Montgomery Tucker and Robert B. Amidon, Asst. U.S. Attys., Roanoke, Va., on brief), for appellee.
 Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.
 WIDENER, Circuit Judge:
 
 
 1
 This is an appeal by ten witnesses from the district court's order disqualifying Sol Z. Rosen, Esquire, and Joseph M. Whitehead, Esquire, from representing them in a grand jury investigation concerning interstate prostitution, where each witness invoked the Fifth Amendment and where the government pointed to three witnesses and Mr. Whitehead as targets of the investigation.
 
 
 2
 In February 1977, a special grand jury for the United States District Court for the Western District of Virginia convened at Lynchburg to investigate possible violations of federal laws against interstate prostitution and racketeering.[1] Messrs. Rosen and Whitehead represented ten of the witnesses subpoenaed to appear before the grand jury. At the opening of the proceedings, the government informed Mr. Whitehead that he was a target of the investigation and asked him to withdraw because some of his clients might be called upon to testify against him. He refused. The court noted the possible impropriety of Mr. Whitehead's continued representation but declined to take any action to disqualify him at that time. It then denied appellants' initial motions to quash the subpoenas and to suppress evidence.
 
 
 3
 When the witnesses represented by Messrs. Rosen and Whitehead came before the grand jury to testify, the government told at least three that they were also potential targets of the investigation. Each of the ten refused to testify on Fifth Amendment grounds.
 
 
 4
 Several motions were again before the court on March 30, including a request for reconsideration of the motions to quash and to suppress evidence. The matter of Mr. Whitehead's possible conflict of interest apparently came up again at that time but no action was taken.
 
 
 5
 When the grand jury reconvened on April 6, 1977, the United States filed a motion to disqualify Mr. Whitehead, arguing that representation of these clients would put him in the position to suppress possible testimony against himself. The government also sought to disqualify Mr. Rosen, arguing that he represented witnesses with possible conflicts of interest, that he could not, for example, advise any one of the witnesses to seek immunity in return for testifying against his other clients, that he would be in a position to use information obtained in attorney-client relationships to the detriment of his other clients, and that his clients made legally unwarranted assertions of Fifth Amendment privilege to protect other persons.
 
 
 6
 The attorneys filed written statements of each witness purporting to waive any defects in their attorney's representation due to possible conflicts of interest. All the waivers were dated February 14 and 15, except one, which was dated April 5.
 
 
 7
 In response to the government's motion to disqualify the two attorneys, the court examined five of the witnesses on voir dire, in camera and ex parte, at appellants' request. It sealed the record of the voir dire also at appellants' request. Based on this voir dire hearing, the court concluded there was "not only a potential but an actual conflict of interest in Mr. Whitehead and Mr. Rosen's representation of multiple witnesses before the Grand Jury," further aggravated because Mr. Whitehead was himself a target of the investigation.
 
 
 8
 We are told that the grand jury has reconvened and that the witnesses have retained other counsel. Still seeking representation by Messrs. Rosen and Whitehead, the witnesses now appeal the district court's order of disqualification. We affirm.
 
 
 9
 The government first argues that this is not an appealable order, noting that in United States v. Hankish, 462 F.2d 316 (4th Cir. 1972), this court declined to decide whether the "collateral order" rule of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), applies to an order disqualifying an attorney. Cohen provides for appeal from an interlocutory order:
 
 
 10
 ". . . which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."
 
 
 11
 We agree with cases in other circuits considering the question since our decision in Hankish. That is, we think Cohen applies here because this order is final and conclusive as to Messrs. Whitehead's and Rosen's representation of these witnesses and because it concerns important rights which might be irretrievably lost if review were denied now. In re Grand Jury Empaneled January 21, 1975, 536 F.2d 1009, 1011 (3d Cir. 1976); United States v. Garcia, 517 F.2d 272, 275 (5th Cir. 1975); In re Investigation before April 1975 Grand Jury, 174 U.S.App.D.C. 268, 531 F.2d 600, n. 8 (1976).
 
 
 12
 Appellants argue that the district court's order unconstitutionally deprives them of an absolute right to counsel of their own choice under the Sixth Amendment. The question of whether or not there is any right to have an attorney represent a witness in grand jury proceedings apart from the Sixth Amendment is not before us, see Mandujano, 425 U.S. p. 581, 96 S.Ct. 1768 for the government has not raised this issue and does not contest such representation here. The only question we consider is whether these particular attorneys, situated as they are, may represent these particular witnesses, before this grand jury.
 
 
 13
 We think there may be doubt, after the Supreme Court's plurality opinion in United States v. Mandujano, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), as to the extent of, and whether there is, a Sixth Amendment right to counsel for a grand jury witness who has not been charged or arrested, whether or not a target of the grand jury's investigation. But, assuming there is, we are doubtful that the right would be absolute when conflicting with, and when posing a threat to, the public's right to the proper functioning of a grand jury investigation, and to the judge's duty to maintain the integrity of the grand jury proceeding he supervises. In re Gopman, 531 F.2d 262, 266 (5th Cir. 1976); In re Grand Jury Proceedings, 428 F.Supp. 273 (E.D.Mich., 1976); Pirillo v. Tarkiff, 462 Pa. 511, 341 A.2d 896 (1975). Cf. In re Grand Jury Empaneled Jan. 21, 1975, 536 F.2d 1009 (3d Cir. 1976); In re Investigation before April 1975 Grand Jury, 174 U.S.App.D.C. 268, 531 F.2d 600 (1976); and In re Investigating Grand Jury, 241 Pa.Super. 246, 361 A.2d 325 (1976), in all of which cases the facts did not support an order of disqualification which distinguished them from our case. None of these last cases dispute the principle.
 
 
 14
 The Supreme Court has noted the importance of the grand jury's investigative function in United States v. Dionisio, 410 U.S. 1, 16-18, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1972):
 
 
 15
 "The Fifth Amendment guarantees that no civilian may be brought to trial for an infamous crime 'unless on a presentment or indictment of a Grand Jury.' This constitutional guarantee presupposes an investigative body 'acting independently of either prosecuting attorney or judge,' whose mission is to clear the innocent, no less than to bring to trial those who may be guilty. . . . The grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor, but if it is even to approach the proper performance of its constitutional mission, it must be free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it." (Citations and footnotes omitted).
 
 
 16
 Pertinent here also is the discussion in United States v. Calandra, 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1973), where the Court emphasized the duty of citizens to testify before the grand jury:
 
 
 17
 "The power of a federal court to compel persons to appear and testify before a grand jury is also firmly established. The duty to testify has long been recognized as a basic obligation that every citizen owes his Government. In Branzburg v. Hayes (408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626), at 682 and 688 (92 S.Ct., at 2657 and 2660), the Court noted that '(c)itizens generally are not constitutionally immune from grand jury subpoenas . . .' and that 'the longstanding principle that "the public . . . has a right to every man's evidence" . . . is particularly applicable to grand jury proceedings.' The duty to testify may on occasion be burdensome and even embarrassing. It may cause injury to a witness' social and economic status. Yet the duty to testify has been regarded as 'so necessary to the administration of justice' that the witness' personal interest in privacy must yield to the public's overriding interest in full disclosure. Furthermore, a witness may not interfere with the course of the grand jury's inquiry . . . Nor is he entitled . . . 'to set limits to the investigation that the grand jury may conduct.' " (Citations and footnotes omitted).
 
 
 18
 Of the five witnesses examined on voir dire, three indicate they apparently disregard that duty, choosing instead a course of noncooperation by improperly invoking the Fifth Amendment privilege to protect from incrimination, not themselves, but their lawyer and other witnesses. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951). A concerted refusal of all grand jury witnesses to testify would cut short that body's investigative function and assuredly "frustrate the public's interest in the fair and expeditious administration of the criminal laws." Dionisio,410 U.S. at 17, 93 S.Ct. at 773. We think the district court entirely justified in intervening under such circumstances to maintain the integrity of the proceeding and to insure that its officers of the court, the lawyers, do not become partners to illegal conduct. Tucker v. Shaw, 378 F.2d 304, 307 (2d Cir. 1967), indicates that early action should be taken to avoid conflict of interest problems.
 
 
 19
 Whether or not there is a Sixth Amendment right to counsel here, a lawyer has certain professional obligations when he undertakes to represent a client. Our canons of ethics require a lawyer's "entire devotion to the interest of the client" in the discharge of his duty as an officer of the Court. Braxton v. Peyton, 365 F.2d 563, 565 (4th Cir. 1966) (citing American Bar Association, Canons of Professional Ethics, Canon 15). Moreover, Rule II § 6, Rules for the Integration of the Bar, 174 Va. xxi-xxii (1939), governing the professional conduct of a lawyer practicing in Virginia, requires him to "represent his client with undivided fidelity."[2] An attorney with undivided allegiance to one of these witnesses might strongly urge him to testify truthfully rather than to risk almost certain contempt of court by invoking the Fifth Amendment to protect others. An attorney with undivided fidelity might also determine that it is in his client's best interest to approach the prosecutor with an offer to testify in return for immunity or leniency, especially when he knows the client is a target of the investigation. And especially when his client's testimony might implicate the attorney himself, we think it unrealistic to assume the attorney can vigorously pursue his client's best interests entirely free from the influence of his concern to avoid his own incrimination.
 
 
 20
 We do not assume Mr. Whitehead is involved in the wrongdoing under investigation. It is for the grand jury to decide whether the evidence warrants indictment against him. But we also cannot say with any assurance that Mr. Whitehead is not in a position to frustrate the grand jury's inquiry into his own participation, if any there be, in the crimes under investigation. Moreover, three of the witnesses told the district court at the in camera hearing they would not testify against Mr. Whitehead, a resolve we think can only be strengthened by the fact that he is their attorney. To avoid the appearance of impropriety on the part of its officers; to avoid a possible frustration of the grand jury proceeding; and because of the actual as well as potential conflict of interest; we think the court properly exercised its discretion in disqualifying Mr. Whitehead.
 
 
 21
 Mr. Rosen's problem is similar, although not as pronounced. Although he is not a target of the investigation, seven of the clients he represents have conflicts of interest with the three who are targets, as well as with Mr. Whitehead, his co-counsel, who is associated with him in the case. Professional ethics prevent Mr. Rosen from advising a witness to seek immunity or leniency when the quid pro quo is testimony damning to his other clients, to whom he also owes a duty of undivided fidelity, not to mention co-counsel. But a lawyer's duty to his witness-client who can benefit from immunity or leniency is to so advise him and, in many circumstances, to request permission to approach the prosecutor on his behalf. The conflicting interests of Mr. Rosen's clients as well as co-counsel prevent him from the discharge of this duty.
 
 
 22
 Mr. Rosen offers us no viable solution to this dilemma. Instead, he offers us written statements from each witness purporting to waive any conflicts of interest arising out of the multiple representation. We find the waivers ineffective under the particular circumstances of this case. So far as they purport to waive "later" "conflict(s) of interest which could develop" in the future, we think they are ineffective on their face.
 
 
 23
 Aside from any Sixth Amendment right to the effective assistance of counsel which may or may not exist here, the witnesses apparently hired Mr. Rosen because they thought him a competent lawyer who would protect their best interest. That is obviously why they agreed to pay for his services.[3]
 
 
 24
 But Mr. Rosen's effectiveness as attorney to each is shackled by the conflict of interest among the witnesses. Nothing in the record indicates that Mr. Rosen ever explained to each client precisely how, in the context of the client's individual situation, the conflict might require Mr. Rosen to use confidential facts learned in their attorney-client relationship to the detriment of that client or to sacrifice that client's best interest in order to faithfully perform his duty to the others. And more importantly, nothing indicates that Mr. Rosen discussed with any of his clients the effect of the actual, rather than potential, conflict of interest between them. Indeed, the conflict in fact arose at the grand jury session on February 16 and 17, when the witnesses were named as targets, after the waivers had already been signed. Without the knowledge of how such change in circumstances affected Mr. Rosen's representation, explained in detail, we think the witnesses could not have understood what they purported to waive in the affidavits. We also think a detailed explanation of how their testimony might affect Mr. Whitehead was owed to each witness.
 
 
 25
 The essence of the waiver question is this. On February 14-15[4] the witnesses signed the waivers of any potential conflict of interest in which they or Messrs. Rosen and Whitehead were or might become involved. The written waivers do not mention Mr. Whitehead being a possible target. At or about that time, three witnesses and Mr. Whitehead were advised they were targets of the investigation. The record does not show that either Messrs. Rosen or Whitehead, although they were both experienced lawyers and knew that their representation was being questioned, ever advised the witnesses of the effect of such conflict on them; neither did they so advise the court that they had so done. We think the attorneys had the affirmative obligation to advise each of their clients, jointly and severally, in detail, of the full effect and legal consequences of the conflicts which had arisen, and to make it clear to the district court that this had been done.[5] Absent a showing that such explanation had been made, we are of opinion the written waivers are ineffective. We do not reach the further question of whether the waivers, if executed by witnesses who previously had full knowledge of all of the facts and legal consequences, might be effective to permit the continued employment of the lawyers.
 
 
 26
 On the whole case, we think there is a conflict of two principles. The first one is the entitlement of the witnesses to representation by an attorney in grand jury proceedings whether as a matter of federal procedural law or constitutional right. The second is the right of the grand jury to pursue its investigative functions, which includes the right of the public to every man's testimony. And not to be forgotten is the right of the courts to control their own officers, the attorneys. "When two principles come in conflict with each other, the court must give them both a reasonable construction, so as to preserve them both to a reasonable extent." Mandujano, 425 U.S. at p. 590, 96 S.Ct. at p. 1783. (Mr. Justice Brennan concurring and quoting from United States v. Burr, 25 Fed.Cas. pp. 38, 39, No. 14692(e) (C.C.Va.1807)). We think when a conflict of interest appears from the record, as it does here, which may affect the grand jury's investigative function and may deprive the public of the testimony of a witness, that the district court, in its discretion, may take appropriate action to remove the conflict, which is all the district judge did in this case. And we think this may be done although it may deprive a witness of a particular lawyer. It does not deprive him of the right to be represented at all, and so both principles are preserved as well as may be.
 
 
 27
 Our opinion should not be read to hold that a witness is not entitled to the assistance of counsel in grand jury proceedings. Neither should it be read to hold that mere multiple representation is of itself disqualifying. We do hold that the district court was within its discretion in disqualifying these attorneys in this case.
 
 
 28
 The judgment of the district court is accordingly
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 Apparently the Mann Act, 49 U.S.C. §§ 1, et seq.; and the Travel Act, 18 U.S.C. § 1952
 
 
 [2]
 "It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose
 "The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."
 
 
 [3]
 A question arose during oral argument as to who was to pay the attorney's fees for these witnesses. Even after the filing of affidavits, the question remains unresolved, but, because we find it unnecessary to our decision, we do not remand for a finding of fact
 
 
 [4]
 One witness signed a waiver on April 5th. She, however, states that she does not believe there is any conflict of interest. This can only indicate the facts were not explained to her or that she has misunderstood them
 
 
 [5]
 It is apparent from the in camera hearing that conflict of interest was mentioned to the witnesses at some time by the attorneys and that some of them at that time may have wished to waive a disqualification. It is equally as apparent that none of them who testified in that hearing had any clear idea of exactly what the conflicts were and their effects
 An affidavit filed by Mr. Rosen after argument may indicate that he "was never advised as to the identity of my clients who were deemed to be targets." Apparently this refers to the government advising him, for it was argued on appeal, outside the record, in explanation of the order denying the stay pending appeal, that the witnesses discussed the matter among themselves, indeed that "Mr. Rosen didn't have to pass any information on, because everyone was present at one point or another and knew who had been designated as target." Another post-argument affidavit filed by Mr. Rosen details that his clients advised him as soon as they were advised they were targets.