In the Matter of INVESTIGATIVE GRAND JURY PROCEEDINGS ON APRIL 10, 1979 AND CONTINUING.

Misc. No. 79–7.

United States District Court, N. D. Ohio, W. D.

Nov. 9, 1979.

James D. Jensen, Asst. U.S. Atty., Toledo, Ohio, for petitioner.

Ted Iorio, Gallon, Kalniz & Iorio, Toledo, Ohio, for respondents.

## OPINION and ORDER

WALINSKI, District Judge:

This matter is before the Court pursuant to the motion of the United States, by James D. Jensen, Assistant United States Attorney, for an order disqualifying Sheldon S. Wittenberg, Esq., and his employer, the law firm of Gallon, Kalniz & Iorio Co., L.P.A., from multiple representation of witnesses subpoenaed to appear before the grand jury to testify concerning an incident occurring on July 3, 1979, at the Plaza Hotel, Toledo, Ohio. The government's motion was filed on October 4, 1979; the respondents, Mr. Wittenberg and the law firm of Gallon, Kalniz & Iorio Co., L.P.A., filed their response on October 15, 1979; and the government filed a reply on October 30, 1979. On November 3, 1979, the Court received sealed originals of certain grand jury minutes and heard arguments by the respective parties. No further evidence was proffered by either party. Leave was granted at the November 3rd hearing for the respondents to file a supplemental brief, which was filed November 9, 1979.

According to the government's motion and the exhibits which it submitted, the grand jury is investigating an incident which occurred on July 3, 1979, at the Plaza Hotel Renovation Project. The government's motion describes this incident as a riot and suspected arson, and asserts that on July 12, 1979, the Federal Grand Jury for this Division began an investigation of those events. During the course of its investigation, the grand jury has subpoenaed approximately twenty-two witnesses.

Two of those witnesses, Mr. Jeffrey A. Chambers and his wife, Mrs. Jeannie Chambers, have been identified as targets of the investigation. When informed of that fact at their initial appearance before the grand jury on July 12, 1979, they invoked their privilege not to testify and were excused. As of the date of the hearing on this matter, according to uncontroverted assertions by the government's attorney, Mr. and Mrs. Chambers are clients of the respondent, Mr. Wittenberg.

In addition, certain labor unions have been identified by the government as targets of the grand jury's investigation. Mr. Wittenberg and the law firm of Gallon,

Kalniz & Iorio Co., L.P.A. were, at the time of the November 3, 1979 hearing, counsel to some of these unions.

With reference to the other twenty witnesses who have been subpoenaed by the grand jury, it is asserted by the government that all but four have been represented and counselled, outside the grand jury room, by Mr. Wittenberg. The respondents point out, however, that nearly one-half of their clients have been subpoenaed merely to produce documents, four witnesses have retained other counsel, and two witnesses represented by them testified and answered most of the questions put to them. Nonetheless, it appears from the record that Mr. Wittenberg presently continues to represent witnesses who have been a) subpoenaed to testify; b) informed that they are not targets of the investigation; and c) counselled by him. (See Transcripts of Witnesses Kelley and Sigurdson, September 6, 1979.)

Thus, based upon information contained in the government's motion, the exhibits submitted at the November 3, 1979 hearing and, with reference to Mr. and Mrs. Chambers and some of the unions, information provided by the parties at that hearing, there is sufficient evidence to support a finding that:

> the respondent, Sheldon S. Wittenberg, Esq., represents two individuals specified as targets of the grand jury investigation;
>
> the respondents, Mr. Wittenberg and the law firm of Gallon, Kalniz & Iorio Co., L.P.A., are counsel to labor unions which are among the targets of the grand jury investigation; and
>
> the respondent, Mr. Wittenberg, has been the attorney for several (though not all) non-target witnesses.

The initial question for decision is whether representation of more than one client in light of these factual findings constitutes a conflict of interest. If so, the next question

is whether the strong remedy requested by the government—disqualification of the respondents from such multiple representation—is the proper resolution of the dilemma created by seeking to serve more than one master.

To assess the existence of a conflict of interest in cases involving motions to disqualify, courts have looked to the American Bar Association's Code of Professional Responsibility. *Cf. In re Taylor,* 567 F.2d 1183, 1191 (2d Cir. 1977).[1] With reference to the conflict suggested by the government in this case, the following Ethical Considerations and Disciplinary Rules from the ABA Code appear pertinent:

> EC5–14 Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant.
>
> EC5–15 If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for

---

1. Although the ABA Code has not been incorporated into the rules of practice for this District, the Code has been adopted by the Ohio Supreme Court for the regulation of its bar. Respondents are licensed to practice in Ohio, and are bound by the Code, as adopted by the Ohio Supreme Court. It appears proper and appropriate, therefore, to apply the same standards to counsel in this Court as they would be expected to satisfy in the state courts.

this reason it is preferable that he refuse the employment initially. . . .

\*   \*   \*   \*   \*   \*

DR5–105  Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C)

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.  (Footnotes omitted.)

In the present case, in light of the showing that respondents represent both individual and organizational clients who have been identified as targets of the investigation and the further showing of representation of clients who have been identified as non-targets, it appears that an actual, and not merely potential, conflict of interest exists.[2]  Where the respondents' non-target clients are called upon to answer questions, the respondents' duty to represent the targets zealously may, and in all likelihood does, compel them to seek to prevent the disclosure to the grand jury of information injurious to the targets.  To accomplish this end, respondents would probably find it necessary to advise the non-target clients to refuse or to avoid answering questions potentially damaging to the target clients.

This advice to a non-target client may, however, be neither in such client's best interests, nor the advice which such client might receive from fully independent counsel.  Advice to remain silent may have several adverse effects on a non-target witness.  First, he or she may forego the opportunity to provide further exonerating information relating to his or her own activities.  Second, where the client, though not a target, desires nonetheless to receive immunity to avoid any possible use of his or her testimony, the lawyer cannot undertake to obtain immunity nor, if immunity has been granted can the lawyer advise the client to testify.  To do otherwise would clearly jeopardize and conflict with the interests of the target clients.  Third, whether or not a non-target witness had been granted immunity, advice from his or her lawyer to refuse to cooperate may lead to

2.  In making a finding that an actual conflict of interest exists, this Court desires to point out that such finding is not intended to impugn or castigate respondents' activities thus far.  The government has made no showing that either Mr. Wittenberg or his firm have acted in fact improperly to derogate the interests of one or more clients in favor of other clients.  Nonetheless, a potential conflict has ripened into an actual conflict (even it it has not "borne fruit" as of this moment).  In light of the fact that the Court has been informed that the grand jury will resume sitting in a few days, the most opportune time to decide the government's motion is at hand.  To delay might cause the conflict which exists to create the dilemma which the ABA Code declares intolerable, and which, this Court is confident, the respondents do not desire to encounter.

imposition of sanctions of a distinctly penal character, regardless of whether an ensuing contempt proceeding is denominated "civil" or "criminal." To avoid entanglement of the non-target client in the inconvenience of appearances before the District Court, the trauma of a contempt hearing and the imposition of potential sanctions, including incarceration, counsel would probably be required to advise the non-target to cooperate. This counsel cannot do where counsel's duty to other clients is to stem disclosure. *See generally* Note, Supervising Multiple Representation of Grand Jury Witnesses, 57 B.U.L.Rev. 544, 563–67 (1977).

■ The apparent willingness or even desire of the non-target client to remain silent, at least at the outset, should not be a factor in assessing the attorney's ability to counsel him or her independently or effectively. A lawyer is often called upon to give a client advice which is unwelcome to the client, and which the client, as a purely personal matter, does not want to hear or follow. But part of a lawyer's duty to a client is to give that advice which, in light of the facts and applicable legal principles, best suits the client's individual interests, even though the client would prefer to be in different circumstances or to be able to follow a more attractive course. The lawyer's duty in this regard can be fulfilled only where the lawyer can advise the client without attention to or concern about the interests of others.

■ It appears, therefore, that joint representation of target and non-target clients creates a substantial danger that the personal and legal interests of the non-target client can be jeopardized, if not sacrificed, as a result of the fact that the attorney owes an equivalent duty of zealous representation and fidelity to the interests of a target client.[3] Similarly, the interests of a target can be just as adversely affected if his or her attorney advises the non-target client to cooperate.

■ In addition, in assessing the impact of an actual or potential conflict on the interests of one or more of the multiple clients, the following Ethical Consideration from the ABA Code, relating to the duty to preserve the confidences and secrets of a client (Canon 4), should be taken into consideration:

> EC4–5 A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes. Likewise, a lawyer should be diligent in his efforts to prevent the misuse of such information by his employees and associates. Care should be exercised by a lawyer to prevent the disclosure of the confidences and secrets of one client to another, and no employment should be accepted that might require such disclosure. (Footnotes omitted.)

Information obtained from a non-target client relating either to a target client's involvement or the non-target's activities or knowledge may be of considerable importance to counsel and the target client as they formulate their strategy and response to the grand jury investigation. And it would appear incumbent upon counsel to use and disclose such information in consultation with the target client. Otherwise, counsel would be representing the target's interests incompletely. But any disclosure of information obtained from the non-target would violate counsel's duty of nondisclosure. Although the non-target can consent to disclosure,[4] it is clear that multiple representation of targets and non-targets, in addition to the basic dilemma of conflicting loyalties and duties, has the collateral consequence of potentially impinging upon

---

3. One commentator has suggested that the risk to the interests and rights of a non-target client may be even greater where the target client is an organization. *See* Note, Supervising Multiple Representation of Grand Jury Witnesses, 57 B.U.L.Rev. 544, 564 65 (1977).

4. It appears that the same *quaere* about the adequacy of waiver of conflict-free counsel, discussed *infra*, pg. 170, can be raised about a non-target's "consent" to disclosure.

counsel's duty to preserve the non-target's confidences.

■ Decisions of other courts support the conclusion that joint representation of targets and non-targets constitutes a conflict of interest warranting remedial judicial action. Most directly on point is the decision of the Fourth Circuit in *In re Investigation Before the February, 1977, Lynchburg Grand Jury*, 563 F.2d 652 (4th Cir. 1977). There one lawyer represented three target and seven non-target clients. Because "[p]rofessional ethics prevent [an attorney] from advising a witness to seek immunity or leniency when the quid pro quo is damning to his other clients," 563 F.2d at 657, the court held that a conflict existed. *Accord, In re Grand Jury Proceedings*, 428 F.Supp. 273, 277 (E.D.Mich.1976) (counsel "would be torn between conflicting loyalties in representation that will have a material impact on their professional recommendations and courses of actions").

Similarly, the District of Columbia Circuit (while holding that insufficient evidence existed to determine whether the attorney represented the target union as well as non-target union members) indicated that if shown, such representation of the union and its non-target members "runs the risk of conflicting interests." *In re Investigation Before the April, 1975 Grand Jury*, 174 U.S.App.D.C. 268, 271 n.4, 531 F.2d 600, 603 n.4 (D.C.Cir.1976) (dictum). In another case in which it was held that there was insufficient evidence to establish a conflict, the court also pointed out that discussions between the government and the lawyer about immunity for one or more clients could cause a possible conflict of interest to arise. *In re Grand Jury Empaneled January 21, 1975*, 536 F.2d 1009, 1011 (3d Cir. 1976) (dictum).

The tension between one client's interest in disclosure and another client's interest in nondisclosure, which is directly related to the conflict in the instant case, has led the Fifth Circuit to uphold a disqualification order. *In re Gopman*, 531 F.2d 262, 266 (5th Cir. 1976). In *Gopman*, a union lawyer represented three union officials who were not targets. Nor was the union itself a target. Nonetheless, the court found that the union's interest in full disclosure of its records in the context of the particular investigation conflicted with the lawyer's advice to the individual clients not to cooperate and to invoke the privilege against self-incrimination.

■ Thus, there appears to be general agreement among the courts which have considered disqualification motions at the grand jury stage that a conflict of interest exists when one lawyer represents targets and non-targets, or when disclosure by one client conflicts with the interest or desire of another client that disclosure not occur. When such circumstances exist, judicially mandated remedial action is warranted—indeed necessary where counsel has not, as recommended by the Code of Professional Responsibility, EC 5–15, resolved all doubts against the propriety of multiple representation. The question then becomes one of the appropriate mode of judicial intervention to avoid the harmful effects of an otherwise unremedied conflict of interest.

The respondents argue that given the present posture of the grand jury proceedings and their activities on behalf of their clients, disqualification is not an appropriate or necessary remedy. Instead, they assert that alternative remedies, which do not impinge so directly or extensively on the right to choose counsel freely, should be undertaken by the government. Among the alternative remedies suggested by the respondents are: presentment of recalcitrant witnesses before the Court to determine the validity of their Fifth Amendment claims; extension of offers of immunity to individual witnesses; and determination of whether the clients desire to waive their right to conflict-free counsel.

■■ The primary decisions supporting the respondents' exhaustion arguments are *In re Taylor*, 567 F.2d 1183 (2d Cir. 1977), and *In re Investigation Before the April, 1975 Grand Jury*, 174 U.S.App.D.C. 268, 531 F.2d 600 (D.C.Cir.1976). In both cases the courts expressed a distinct preference for traditional methods of dealing with uncoop-

erative witnesses. 567 F.2d at 1192, 174 U.S.App.D.C. at 276, 531 F.2d at 608. It is clear that prior to ordering the drastic remedy of disqualification, a court should consider the alternatives suggested by these cases and argued by the respondents in this case. Where, however, a potential conflict has ripened into an actual conflict, the alternatives must be examined carefully to determine whether they adequately respond to the dangers to the clients' rights and interests posed by the conflict. In addition, the impact on the grand jury's operation should be considered in assessing the merit of any proposed alternative remedy.

At the outset, it should be noted that neither *Taylor* nor the *April, 1975 Grand Jury* case involved situations in which actual conflict, of the sort present in this case, existed. In *Taylor*, the court emphasized that the government refused to disclose the basis for the alleged conflict of interest between the jointly represented clients. This, coupled with the lower court's use of an *in camera* hearing, led the appellate court to find that basic due process, namely notice, had been disregarded by the District Court in reaching its decision to disqualify the attorney. A similar procedure was not followed in the instant case, in which the respondents had ample notice and opportunity to be heard.

Additionally, the four persons being represented jointly in *Taylor* were all suspects, so that there was not the clear conflict which is present with representation of targets and non-targets. Nor was there an organizational target in *Taylor*, as there is here. In sum, the smaller size of the nut in *Taylor* made it reasonable to conclude that it might be cracked without exerting the extreme pressure of an order of disqualification.

As mentioned earlier in this opinion, the facts of the *April, 1975 Grand Jury* case reduce the significance of its imposition of an exhaustion requirement. The court emphasized "how little we can discern from the record as to the precise nature of the asserted conflicting interests." 174 U.S. App.D.C. at 275, 531 F.2d at 607. Here, the record shows a considerably clearer conflict, which calls for more extensive and specific judicial response.

Thus, the primary cases supporting the respondents' exhaustion claim appear distinguishable and inapplicable, given the conflict present here. Nonetheless, the individual alternative remedies suggested by the respondents will be examined to determine their suitability in light of the facts of this case.

■ The procedure endorsed by the District of Columbia Circuit in the *April, 1975 Grand Jury* case—presentment of uncooperative witnesses to the district court to ascertain the validity of a Fifth Amendment assertion—would appear to be a preferable preliminary procedure in most instances. Certainly the record would be made more complete. But this is not to say that, where an actual conflict is found to exist, this procedure is a prerequisite to a disqualification order. Where an actual conflict exists, the Court, in deciding whether to enter a disqualification order or to direct the pursuit of less intrusive remedies, should consider the additional elements of a) the impact of a presentment requirement on the grand jury's operation, and b) the adverse effects of allowing the continuation of a conflict of interest.

■ In the present case, where several witnesses have been subpoenaed, a presentment requirement could cause significant delay to the grand jury and impose a not inconsiderable burden on the Court and the United States Attorney's office. More importantly, the ethical prohibition against an attorney's representing parties whose interests conflict is sufficiently basic and intolerable that proceeding immediately with a directly effective remedy appears appropriate. The longer that a conflict of interest is not resolved or remedied, the longer that one, if not all, of the affected parties may be deprived of the right to independent and effective counsel. Furthermore, an inquiry into the validity of the party's invocation of the privilege against self-incrimination simply fails to address or reduce the danger to a client's right to independent counsel

which a conflict creates. In circumstances such as exist here, the preliminary inquiry demanded by the respondents would side-track the more pressing need to avoid the adverse effects of permitting a conflict of interests to endure. In this situation expeditious resolution, rather than further delay, is called for.

■ The second remedy suggested by the respondents, and endorsed by the Second Circuit in *Taylor*, 567 F.2d at 1192, is to offer immunity to one or more of the witnesses. This argument disregards several concerns. First, an offer of immunity, once given, creates or increases the conflict of interest, instead of resolving an existing conflict. *See In re Grand Jury of January 21, 1975*, 536 F.2d 1009, 1011 (3d Cir. 1976). Counsel's duty to the immunized witness to help the witness avoid the sanction of contempt conflicts as much if not more with the duty to represent target clients zealously. Thus, in a case such as this immunity makes resolution of the conflict more difficult, rather than leading to its elimination. Indeed, the respondents acknowledge that "a conflict of interest would exist in a situation where an attorney representing multiple witnesses represents a client who has been granted immunity and also a client who has not been granted immunity, * *." (Respondents' Brief at 3.) Thus, the respondents themselves appear to perceive the fundamental flaw in the court's approach in *Taylor*—that immunity intensifies rather than avoids conflicts of interests.

■ The third alternative proposed by the respondents, namely ascertainment of whether the jointly represented parties have waived their right to conflict-free counsel, appears to be their strongest argument. As the court stated in *Taylor*, "Once the Court is satisfied, * * *, that such a client knowingly and intelligently wishes to proceed with joint representation, the court's responsibility is met, and it is without power unilaterally to obstruct the choice of counsel." 567 F.2d at 1191.

Various procedures to determine whether a waiver is valid have been recommended or approved by the courts. These generally involve an inquiry by the district court. *See, e. g., In re January 21, 1975, Grand Jury*, 536 F.2d 1009, 1010–11 (3d Cir. 1976); *In re Grand Jury*, 446 F.Supp. 1132 (N.D. Tex.1978). *See also In re Investigation Before the April, 1975 Grand Jury*, 174 U.S. App.D.C. at 268, 276, 531 F.2d 600, 608 (D.C.Cir.1976).

The waiver approach, however, disregards several factors. First, waiver of conflict-free counsel in the context of a grand jury proceeding affects interests beyond those of the clients involved: Namely, "the right of the public to an effective functioning grand jury investigation." *In re Grand Jury Proceedings*, 428 F.Supp. 273, 278 (E.D.Mich.1976). No private individual can waive this public right. *Id.* Were all clients to waive the conflict of interest the result would be to facilitate legally impermissible efforts by non-target witnesses to "stonewall" the grand jury's investigation. "Stonewalling" conflicts with the public's "right to every man's evidence," which the Supreme Court has repeatedly upheld. *See e. g., United States v. Mandujano*, 425 U.S. 564, 571, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); *United States v. Calandra*, 414 U.S. 338, 343–44, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). As *Calandra* emphasizes, a witness is not entitled to set limits on the investigation being conducted by the grand jury. 414 U.S. at 345, 94 S.Ct. 613.

In light of this potential impact on the grand jury's operation, at least one court has held that, in a case of actual conflict such as exists here, no valid waiver can occur. *In re Grand Jury*, 446 F.Supp. 1132, 1140 (N.D.Tex.1978) (dictum). Only in this fashion can the adverse impact of stonewalling be avoided, and the public's right to an effective grand jury be upheld.

Certain practical considerations provide additional support for this approach. First, a *quaere* should be posed whether the waiver would meet the "knowing and intelligent and voluntary" standard required under basic constitutional principles. *See id.* ("The waiver would be illusory.") The problem in this regard is that the danger exists that counsel cannot, by intellectual footwork, re-

move himself from the position of conflicting interests sufficiently far or long enough to provide neutral and objective advice about the proper course to follow. Advice to client A to secure other counsel might be adverse to client B's interests, while advice to client A not to obtain other counsel might be adverse to that client's interests.

Second, aside from this question, the record in this case raises some question about the adequacy of the advice given by Mr. Wittenberg concerning the existence and consequences of, and remedies for, the conflict of interest which exists here. The transcript of the witness Ladd shows considerable uncertainty on his part with regard to the advice given to him. (Transcripts of Witness Ladd, August 1, 1979, at 24; September 6, 1979, at 48–52.) To the extent that a witness lacks adequate understanding of the existence and consequences of and remedies for a conflict, no "knowing, intelligent and voluntary" waiver can be obtained. *See In re Investigation Before the February, 1977, Lynchburg Grand Jury,* 563 F.2d 652, 657–58 (4th Cir. 1977). In any event, it has been held that waivers purporting to relate to conflicts which may arise in the future are invalid. *Id.*

Therefore, in light of the existence of an actual conflict of interest, and in light of this Court's determination that the alternative remedies suggested by the respondents would not effectively serve the interests of their clients or the interests of justice,

IT IS THEREBY ORDERED THAT:

1. The government's motion that Sheldon S. Wittenberg, Esq. and the law firm of Gallon, Kalniz & Iorio Co., L.P.A., be, and the same hereby is, granted;

2. The respondents be, and they hereby are, ordered to represent no more than either one individual witness or one target organization relating to the grand jury's investigation of the incident occurring on July 3, 1979, at the Plaza Hotel Renovation Project;

3. The respondents shall, prior to 5:00 P.M., Monday, November 12, 1979, inform all persons and organizations previously represented by them with reference to said investigation:

(a) of the entry and effect of this Order; and

(b) that any such person or organization (except the person or organization continued to be represented by respondents) desiring to obtain legal representation relating to said investigation must obtain separate and independent counsel for such purpose;

4. The Assistant United States Attorney appearing before the grand jury in further proceedings relating to said investigation shall:

(a) ascertain, with reference to each witness appearing before the grand jury, whether such witness has secured counsel, and if so, that counsel's representation does not contravene paragraph one of this Order; and

(b) in the event such representation contravenes paragraph one of this Order, inform this Court immediately of such fact.

5. The Clerk shall mail a copy of this Opinion and Order to each witness who has been or may be subpoenaed by the grand jury with reference to this particular investigation.

IT IS SO ORDERED.