**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Albert Juan NUNEZ,**
**Defendant-Appellant.**

**No. 79–1500.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted July 9, 1980.

Decided Aug. 31, 1981.

Rehearing Denied Feb. 23, 1982.

**1118**

Sander N. Karp, Denver, Colo. (Jeffrey A. Goldstein, Denver, Colo., was on the brief), for defendant-appellant.

Kathryn H. Richman, Asst. U. S. Atty. (Joseph Dolan, U. S. Atty., Denver, Colo., was on the brief), for plaintiff-appellee.

Before SETH, Chief Judge, and HOLLOWAY and SEYMOUR, Circuit Judges.

HOLLOWAY, Circuit Judge.

This is a direct appeal by defendant-appellant Nunez from his jury conviction on one count of a two-count indictment charging him with possession of counterfeit obligations of the United States with intent to defraud, in violation of 18 U.S.C. § 472.

Prior to trial the Government successfully moved to dismiss the first count of the indictment charging possession and concealment of numerous counterfeit obligations. The case was tried on Count two of the indictment which charged, *inter alia*, that the defendant "with intent to defraud, had in his possession a falsely made and counterfeited obligation of the United States, to wit: one ten-dollar Federal Reserve Note . . . ." The jury returned a guilty verdict on this count and the district court, after denying a new trial motion, sentenced the defendant to five (5) years' imprisonment. This timely appeal followed.

As grounds for reversal the defendant argues that the trial court erred (1) in failing to hold an in camera hearing to deter-

mine whether a prosecution witness properly invoked his Fifth Amendment privilege; (2) in refusing to give the jury a requested instruction concerning the credibility of a witness who invokes his Fifth Amendment privilege; (3) in failing to strike the testimony of the prosecution witness who invoked his Fifth Amendment privilege during cross-examination; (4) in refusing to grant a mistrial following testimony from a prosecution witness that he was in protective custody; (5) in giving an accomplice instruction when there was no evidence to support such an instruction; (6) in refusing to grant a dismissal of the indictment on the grounds that the evidence before the grand jury was insufficient to find probable cause, that testimony before the grand jury was inflammatory, and that such testimony shows an unlawful use of the grand jury by the Government; (7) in failing to grant a dismissal due to a prejudicial variance between the allegations in the indictment and the evidence presented at trial; and (8) in refusing to grant a judgment of acquittal, the evidence being insufficient to support the verdict.

It is convenient to outline a few facts initially and to discuss the remainder separately as they relate to each argument.

## I

Viewing the evidence, together with reasonable inferences therefrom in the light most favorable to the Government as we must on this appeal from a guilty verdict, *United States v. Twilligear*, 460 F.2d 79, 80–81 (10th Cir.), the evidence tended to show the following facts.

On October 26, 1978, Douglas Pruett, a gas station owner in Colorado Springs, Colorado, received a ten dollar ($10.00) counterfeit bill from a customer as payment for gasoline. At the time Pruett accepted the bill he did not know that it was counterfeit. However, he did notice that it felt "strange." Pruett did not pay any particular attention to the person who handed him the bill and, at trial, was unable to identify the defendant as the person who passed the counterfeit note to him.

The next day, October 27, Pruett attempted to deposit his daily receipts at the Bank of Colorado in Colorado Springs. The bank teller who received the deposit noticed as she was counting the money that one of the $10 bills "looked quite out of the ordinary." She took the bill to her supervisor who contacted the Secret Service office in Denver. During the phone conversation it was determined that the bill was counterfeit. Two days later the bank teller completed a Counterfeit Note Report and mailed it along with the $10 bill to the Denver office of the Secret Service.

The report and the bill were received by the Secret Service on October 30 and the investigation was assigned to Special Agent Robert Haven who subsequently sent the bill to Washington, D. C., for fingerprint examination. The fingerprint analysis was performed by Charles Richardson, an expert in fingerprint identification, who testified at trial that he found the defendant's thumbprint on the bill in question. (II R. 41, 45). The defendant stipulated at trial that the $10 bill was counterfeit and that his thumbprint appeared on that bill. (II R. 32, 41).

The Government also presented the testimony of John Schmidt, a convicted felon who, pursuant to a plea bargain, agreed to testify at defendant's trial. Schmidt testified that the defendant had asked him if he wanted to purchase some counterfeit money in denominations of tens and twenties; that the defendant demonstrated the quality of the money by soaking a counterfeit bill in water and comparing it to a real bill which had also been soaked in water; that the defendant introduced him to two men, who made two deliveries of the counterfeit money. (II Supp.R. 7–8, 31).

Schmidt further testified that during the month of October 1978 he had made two separate purchases of counterfeit money; that defendant had met him and also discussed the counterfeit money by phone; that defendant had told Schmidt the money was a "half hour away." Schmidt also testified that the defendant had told him that the counterfeit money "was the best money

he had ever seen;" the defendant and the two other men told him they had been passing the counterfeit money throughout the four corner States—Colorado, New Mexico, Utah and Arizona—and Kansas and Nebraska and that Schmidt should not pass the counterfeit money there since those areas were "saturated." (II Supp.R. 4–12, 17–21, 32–41).

Special Agent Robert Haven testified that he had arrested Schmidt on October 26, 1978, in Denver, Colorado, that at the time of the arrest he found approximately $5,340 of counterfeit currency in Schmidt's vehicle, and that pursuant to Schmidt's consent he searched Schmidt's residence and surrounding premises and found approximately $55,000 of counterfeit bills in denominations of tens and twenties. Agent Haven also testified that the counterfeit $10 bill which had defendant's thumbprint on it and the counterfeit $10 bills which were seized from Schmidt's vehicle and the shed at his residence were the "same" and "were of common manufacture." (II R. 66–67, 76). Further evidence will be detailed as we discuss defendant's appellate contentions.

## II

On several occasions during his testimony Schmidt, the main prosecution witness, invoked his Fifth Amendment privilege and refused to answer questions relating to a pending state drug charge. With one exception the district court, upon request, ordered Schmidt to answer questions asked by defense counsel during cross and recross examination. Schmidt complied and answered the questions.

The single instance where the district court permitted Schmidt to invoke his testimonial privilege occurred on the last question asked by defense counsel and is reflected by the following colloquy (id. at 47–48):

Q: [By Mr. Karp, defense counsel] Now, the matter that you didn't want to go into detail about, Mr. Schmidt, about the purchase of the [counterfeit] money and how you were going to use the money on your pending drug case, can you tell us why, what was your thinking about this, why you did that?

A: Due to the fact that the state case is still pending, I don't want to answer that question.

Q: You don't want to tell us why you purchased the counterfeit money and how you thought it was going to help you out on a drug case?

A: That is correct.

Q: Are you invoking your Fifth Amendment privilege, is that what you're doing, Mr. Schmidt?

A: That is correct.

Defense counsel immediately asked the district court to order the witness to answer the question. The court was unsure whether the potential answer could be incriminating and therefore asked Schmidt's counsel whether the privilege was being properly invoked. Schmidt's counsel answered affirmatively and the court refused to order Schmidt to answer. Defense counsel did not make an offer of proof concerning the answer that he expected from Schmidt, nor did he ask the trial court to hold an in camera hearing to determine the propriety of the claimed privilege. Instead, defense counsel merely indicated that he had no further questions for the witness. (Id. at 47–48). After Schmidt was excused defense counsel did move to strike the testimony on the ground that the witness had invoked the Fifth Amendment and refused to answer certain questions. The court denied the motion.

On this appeal the defendant generally argues that the district court erroneously permitted Schmidt to invoke his Fifth Amendment privilege. He specifically says that the court erred in failing to hold an in camera hearing on the question and in relying on the "bald assurance" of the witness and his counsel that the privilege was being properly invoked. (Brief of Appellant at 13–15).

It is clear that a witness's Fifth Amendment privilege does not exonerate him from giving testimony merely because he declares that his answers would tend to

be incriminating. *See Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118. It is for the trial judge in the first instance to decide whether the witness's silence is justified and to order him to answer only if it is "perfectly clear" that the witness is mistaken and that the answers "cannot possibly" tend to incriminate. *Id.* at 486, 488, 71 S.Ct. at 818, 819. In making this determination the judge must liberally construe the privilege in favor of the right it was intended to secure. *Id.* at 486, 71 S.Ct. at 818.

■ Here the record shows that at the time of Schmidt's testimony there was an unrelated state drug charge pending against him. The question asked on re-cross-examination by defense counsel related directly to this pending state charge and clearly sought an answer concerning the witness's intended use in the state action of the counterfeit money which he had purchased from the defendant.[2] The potential for incriminating answers is evident and requires no further discussion. Where the circumstances supporting the privilege claim are already known to the court, as they were here, there is no error in failing to hold an in camera hearing to obtain additional evidence to support the claim.[3] *See In re Brogna*, 589 F.2d 24, 28 & n.5 (1st Cir.); *see also United States v. Van Deveer*, 577 F.2d 1016, 1018 (5th Cir.); *United States v. Harris*, 542 F.2d 1283, 1298 (7th Cir.), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779.

Alternatively the defendant argues that his Sixth Amendment right of confrontation was denied when the district court limited his examination of Schmidt by permitting the witness to invoke his Fifth Amendment privilege. He claims that he was denied the right to fully cross-examine this crucial Government witness in an area that was opened up by the Government and that the court erred when it refused to strike all of Schmidt's testimony. (Brief of Appellant at 15–17).

■ It is true that the Sixth Amendment Confrontation Clause guarantees a criminal defendant the right to cross-examine witnesses against him. *See, e. g., Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347; *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 749–50, 19 L.Ed.2d 956. Where the witness which the defendant seeks to cross-examine is the chief Government witness, providing the crucial link in the prosecution's case, the importance of full cross-examination is necessarily increased. *See Davis v. Alaska, supra*, 415 U.S. at 317–18, 94 S.Ct. at 1110–1111; *United States v. Summers*, 598 F.2d 450, 460 (5th Cir.). Thus, where a defendant's cross-examination is restricted by the competing Fifth Amendment right of the witness, it may be necessary to strike all or a part of the direct testimony of that witness. *See, e. g., Turner v. Fair*, 617 F.2d 7, 10 (1st Cir.); *United States v. LaRiche*, 549 F.2d 1088, 1096–97 (6th Cir.), *cert. denied*, 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 383; *United States v. Gould*, 536 F.2d 216, 222 (8th Cir.); *Fountain v. United States*, 384 F.2d 624, 628 (5th Cir.), *cert. denied*, 390 U.S. 1005, 88 S.Ct. 1264, 20 L.Ed.2d 105;

---

**2.** The defendant claims that this line of questioning was appropriate since it was initially raised by the government. (Brief of Appellant at 14–15). Although the Government did ask Schmidt on redirect examination to explain why he purchased the counterfeit money from the defendant, the record does show that Schmidt refused to answer the question due to the pending state charge. Thus this is not a case where the witness has waived his right to assert his Fifth Amendment privilege by testifying about the privileged matter on direct or redirect examination.

**3.** The record does not support defendant's claim that the trial court in ruling on the privilege claim improperly relied on the "bald assurance" of Schmidt and his counsel that the privilege was being properly invoked. The trial transcript shows that prior to the challenged ruling the district court considered on three separate occasions Schmidt's claim that his answers to certain questions asked by defense counsel would tend to incriminate him in the pending state criminal action. In each instance the district court, upon request by defense counsel, denied the privilege claim and ordered Schmidt to answer the questions. Under these circumstances defendant's argument cannot be sustained.

*United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55.

 However, as the cases indicate, not every invocation of the Fifth Amendment privilege by a witness results in a denial of the defendant's Sixth Amendment right of confrontation requiring that the witness's testimony be stricken. In determining whether the testimony of a witness who successfully invokes the Fifth Amendment privilege during cross-examination may be used against the defendant, courts have drawn the line between cases in which the defendant is precluded from inquiring into collateral matters bearing only on the credibility of the witness and those cases in which the defendant is precluded from inquiring into matters about which the witness testified on direct examination. The Second Circuit has stated:

> Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him . . . . On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part. . . .

*United States v. Cardillo, supra,* 316 F.2d at 611 (citations omitted); *accord, Turner v. Fair, supra,* 617 F.2d at 10; *United States v. LaRiche, supra,* 549 F.2d at 1097; *United States v. Gould, supra,* 536 F.2d at 222; *Fountain v. United States, supra,* 384 F.2d at 628; *see also Kolod v. United States,* 371 F.2d 983, 990 (10th Cir.), *vacated and remanded on other grounds,* 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (per curiam).

Here the inquiry into Schmidt's motive for purchasing the counterfeit money from the defendant was first initiated by defense counsel during cross-examination. Schmidt was asked by defense counsel whether he had told Special Agent Haven that he had purchased the counterfeit money to help himself out in a pending drug case. (II Supp.R. 23). Schmidt invoked his Fifth Amendment privilege and the district court, upon request by defense counsel, ordered Schmidt to answer whether he had made such a statement to the agent. Schmidt then answered that he had made the statement. (*Id.* at 24).

On redirect-examination the prosecutor asked Schmidt if he would explain why he obtained the counterfeit money from the defendant. After consulting with his attorney, Schmidt refused to answer the question. The prosecutor then went on to other matters without asking any further questions on the point. (*Id.* at 30–40). As noted earlier defense counsel, on recross-examination, asked Schmidt to explain why he had purchased the counterfeit money and how the money would help him on the pending state drug charge. Schmidt again refused to answer the question and the district court, after receiving a brief comment from Schmidt's counsel, determined that the privilege was properly invoked and refused to order Schmidt to answer the question. (*Id.* at 47–48).

It is clear from the record that the Government did not initiate the inquiry into Schmidt's motive for purchasing the counterfeit money and his anticipated use of the money in his pending state criminal action. Moreover, the single question which Schmidt successfully declined to answer sought information that was collateral to the matters raised on direct examination. Defendant had ample opportunity to otherwise challenge the witness's lack of credibility. During cross and recross-examination Schmidt was thoroughly questioned on his prior criminal record, on his plea-bargain agreement with the United States Attorney's office, and on the important discrepancies between his statements to state and federal authorities after his arrest and his trial testimony. Additionally, Schmidt admitted during defense counsel's questioning that in his post-arrest interview with Secret Service agents he had not told the truth concerning the amount of counterfeit money which he had received. (II Supp.R. 13–29, 41–48).

More importantly, defense counsel was able to obtain through the testimony of Special Agent Haven the impeaching evidence concerning Schmidt's motive behind his purchase of the counterfeit money from defendant. Agent Haven testified that Schmidt had told him during an interview that he had intended to turn the counterfeit money over to the local police department hoping that "it could possibly help him with the [state] drug arrest charges that he currently had." (II R. 70). Based on this evidence, defense counsel argued to the jury during closing arguments that Schmidt's testimony was unbelievable because, among other things, he was trying to obtain a favorable deal on his pending state charge. (*Id.* at 108–09).

 Under the circumstances we are unable to hold that defendant's Sixth Amendment right of cross-examination was materially prejudiced when the district court permitted Schmidt to invoke his Fifth Amendment testimonial privilege on one question. We recognize that the Sixth Amendment may be violated where the defendant is prevented from placing facts before the jury from which bias, prejudice, or a lack of credibility of a prosecution witness may be inferred. *See Davis v. Alaska, supra*, 415 U.S. at 316–18, 94 S.Ct. at 1110–1111. However, the defendant here had effective alternative means available to him to impeach the credibility of Schmidt. *United States v. Brown*, 634 F.2d 819, 825–26 (5th Cir.). The record shows that the jury did in fact have sufficient information upon which to make a discriminating appraisal of Schmidt's credibility. Accordingly, the trial judge did not err in refusing to strike Schmidt's testimony.

 Defendant's final contention with respect to Schmidt's invocation of his Fifth Amendment privilege is that the trial court erred in refusing to give the jury a requested instruction concerning the credibility of a witness who invokes the Fifth Amendment. In essence the requested instruction told the jury that in assessing the credibility of a witness it could consider the witness's refusal to answer questions or his invocation of the Fifth Amendment privilege. (I R. 36). Such an instruction is inappropriate, however. "It is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense." *Bowles v. United States*, 439 F.2d 536, 541 (D.C.Cir.) (en banc), *cert. denied*, 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533; *accord United States v. Vandetti*, 623 F.2d 1144, 1148 (6th Cir.); *United States v. Harris, supra*, 542 F.2d at 1298; *United States v. LaCouture*, 495 F.2d 1237, 1240 (5th Cir.), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648; *United States v. Johnson*, 488 F.2d 1206, 1211 (1st Cir.); *see also Namet v. United States*, 373 U.S. 179, 190–91, 83 S.Ct. 1151, 1156–57, 10 L.Ed.2d 278; *but cf. Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810. Thus the district court did not err in refusing to give the requested instruction.

### III

Prior to Schmidt's testimony the defendant filed a motion in limine, which sought an order, *inter alia*, prohibiting Schmidt from testifying that he first met the defendant in a Denver district courtroom. (I R. 37–38). The district court agreed and told the Assistant United States Attorney to caution Schmidt not to mention the location or the circumstances of his initial meeting with the defendant. When the prosecuting attorney told the court that she had cautioned Schmidt not to volunteer certain information, the district court stated: "I hope he's not a volunteerer, but if he is, I'll step on him pretty hard." (II R. 51–52).

After stating his name, Schmidt testified in the following manner (II Supp.R. 2):

Q: Where do you reside, Mr. Schmidt?
A: City and County of Denver Jail.
Q: I'm sorry?
A: In the City of Denver Jail, County Jail.
Q: How come you're residing in the jail now, Mr. Schmidt?

A: I'm in protective custody.

Defense counsel immediately objected to the testimony and the court sustained the objection but refused to allow counsel to approach the bench. No curative instruction was given by the court and no statement was made by the judge that the question and answer were stricken and should be disregarded. The trial judge only stated after defense counsel asked to approach the bench (II Supp.R. 3):

THE COURT: No, I will sustain the objection to this type of testimony. Just you go right ahead and have him bring out the facts.

Prior to beginning cross-examination defense counsel also moved for a mistrial, claiming that the defendant had been prejudiced by Schmidt's comment that he was in protective custody. The district court indicated that the comment was "unfortunate" but that it did not call for a mistrial. Additionally the court noted, and defense counsel agreed, that an instruction to the jury would only serve to "highlight" the comment. (II Supp.R. 12–13). No further comments were made concerning Schmidt's custodial status and the information was not expanded upon or used in anyway by the Government in closing arguments. As noted, no specific instruction concerning the comment was ever given to the jury. However, the jury was given the general instruction at the end of trial that it should not consider any evidence that was rejected by the district court. (II R. 130).

On this appeal the defendant argues that in light of the district court's order on his motion in limine, the court erred in refusing to grant a mistrial after Schmidt had testified that he was in protective custody. He says that the prosecution did not follow the court's instruction to caution Schmidt not to volunteer information and that it is clear the prosecution intended to use against him the fact that Schmidt was in protective custody. (Brief of Appellant at 17–19; Reply Brief of Appellant at 7–8).

Under some circumstances evidence showing that a witness is in protective custody may be prejudicial to the defendant.

*See United States v. Rios*, 611 F.2d 1335, 1349 (10th Cir.). However the district court quickly sustained defendant's objection to Schmidt's remark that he was in protective custody. Unlike the situation in *Rios*, the Government here did not attempt to make any further use of the comment. *Id.* at 1342–43, 1349–50 & n.27. Further, the fact that curative instructions were not immediately given to the jury to disregard the evidence does not in itself amount to reversible error in these circumstances. Both defense counsel and the trial judge expressed their belief that a curative instruction to the jury would unnecessarily "highlight" the comment made by Schmidt.

Defendant argues that the Assistant United States Attorney intentionally elicited the comment from Schmidt in violation of the district court's order. From the state of this record we cannot agree that the claim of intentional prosecutorial misconduct is established, as we held in *United States v. Westbo*, 576 F.2d 285 (10th Cir.).

 From this record we are not persuaded that there is a reasonable possibility that the single protective custody comment by Schmidt contributed in any way to defendant's conviction. *See United States v. Bishop*, 534 F.2d 214, 220 (10th Cir.). The ruling on the motion for a mistrial based on the comment was a matter within the trial judge's sound discretion, which is not disturbed absent abuse of discretion. *See United States v. Evans*, 542 F.2d 805, 815 (10th Cir.), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550; *McBride v. United States*, 409 F.2d 1046, 1048 (10th Cir.), *cert. dismissed*, 396 U.S. 938, 90 S.Ct. 282, 24 L.Ed.2d 240; *Brown v. United States*, 380 F.2d 477, 479 (10th Cir.), *cert. denied*, 390 U.S. 962, 88 S.Ct. 1062, 19 L.Ed.2d 1158. On the record before us, we cannot say that the trial court abused its discretion in denying defendant's motion for a mistrial.

IV

Defendant also argues that the trial court erred in giving the jury an "accomplice

instruction" over his objection. He says that Schmidt was the only witness who could remotely be considered an accomplice and that there was insufficient evidence from which the jury could conclude that Schmidt was his accomplice in the specific crime with which he is charged. He further argues that the prejudicial effect of the instruction was the clear implication that "Schmidt's actions were as an accomplice to the illegal possession of the defendant" and that "the jury could only conclude that, by association, the defendant must also have been guilty of illegal possession of counterfeit notes," relying on *United States v. Balodimas*, 177 F.2d 485 (7th Cir.), *inter alia.* (Brief of Appellant at 19–23; Reply Brief of Appellant at 9–10).

We have examined the district court's instructions to the jury and, taken as a whole, we are convinced that the charge was not infected with prejudicial error and that the jury was not misguided as to the applicable law. The trial judge correctly informed the jurors that they were the sole judges of credibility and the weight to be given to the testimony. (II R. 128). The court essentially instructed the jury, without naming Schmidt, that the testimony of an informer and an accomplice should be weighed with care. (*Id.* at 127).[4]

Here the trial judge's charge did not include an unfounded pronouncement on the facts as was made in *United States v. Balodimas*, 177 F.2d 485, 487 (7th Cir.)

that two employees of the defendant who testified "have openly admitted that they are law violators and have openly admitted the part that they had in the commission of crime." There the Seventh Circuit said that if the jurors accepted the trial judge's theory that the witnesses were accomplices and that they had made such admissions, it was difficult to discern how the jurors could have avoided the conclusion that the defendant was also guilty. Thus it was held that prejudicial error occurred in the giving of the accomplice instruction there. That kind of damage was not done by the accomplice and informer instructions here.

We find no error here in the giving of the instructions. If any error did occur, it was clearly harmless. Rule 52(a), F.R.Crim.P.

V

The defendant argues that the district court erred in refusing to dismiss the charge against him on the ground that the grand jury lacked probable cause to indict him. He says that "there was no evidence presented to the grand jury linking ... [him] to the crime charged, or any other crime." (Brief of Appellant at 24).

In *United States v. Kysar*, 459 F.2d 422, 424 (10th Cir.), we held:

The return of an indictment by a grand jury is a conclusive determination of the issue of probable cause. If the indictment is fair upon its face and properly

---

4. The charge included the following statements (II R. 127):

Now an informer is someone who provides testimony against another in exchange for immunity from punishment or for personal advance or because of vindictiveness. An informer's testimony must be weighed with greater care than the testimony of an ordinary witness. You must consider and determine whether such testimony has been affected by prejudice or bias.

\* \* \* \* \* \*

An accomplice is someone who unites with another person in the commission of a crime, voluntarily and with an intent. An accomplice is not an incompetent witness because of participation in the crime charged. In fact, the testimony of an accomplice, standing alone, if believed by you, may be of sufficient weight to sustain the verdict of guilty.

However, you should keep in mind that such testimony is always to be received with caution and it is to be weighed with great care.

As a precaution, the trial judge was most likely following the cases in which we have held that it is plain error not to give a cautionary instruction on the care with which an accomplice's or informer's uncorroborated testimony is to be considered by jurors. *E. g.*, *United States v. Hill*, 627 F.2d 1052, 1053–55 (10th Cir.); *United States v. Owens*, 460 F.2d 268, 269 (10th Cir.); *Todd v. United States*, 345 F.2d 299, 300–01 (10th Cir.). Even if their testimony is corroborated in critical respects, we nevertheless favor careful instructions calculated to call attention to the character of the testimony, leaving to the jury the ultimate question of its value and credibility. *Id.* at 300; *United States v. Hill, supra*, 627 F.2d at 1054.

found and returned, the trial court cannot look behind the indictment to determine if it is based on inadequate or incompetent evidence. (Footnotes omitted).

See also *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397; *United States v. Radetsky*, 535 F.2d 556, 565 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81.

 The defendant does not claim that the indictment is invalid on its face or that it was returned by an improperly constituted grand jury. *See United States v. Addington*, 471 F.2d 560, 568 (10th Cir.). While he does say on this appeal that certain testimony before the grand jury by a Secret Service agent was "inflammatory" and inspired bias and prejudice against him,[5] *see id.* at 568, he made no such claim or argument in his pretrial motion to dismiss. (I R. 13–14). Consequently this claim of error is not properly preserved for review. *See* F.R.Crim.P. 12(b) and (f); *see also Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216. In any event the comment complained of here is clearly not prejudicial per se and does not, by itself, satisfy defendant's burden of affirmatively showing a biased grand jury. *See Laughlin v. United States*, 385 F.2d 287, 291–92 (D.C. Cir.), *cert. denied*, 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103; *Gorin v. United States*, 313 F.2d 641, 645 (1st Cir.), *cert. denied*, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052; *Beck v. United States*, 298 F.2d 622, 627 (9th Cir.), *cert. denied*, 370 U.S. 919, 82 S.Ct. 1558, 8 L.Ed.2d 499.

 Defendant also claims that the indictment should have been dismissed because the alleged improper comment of the Secret Service agent shows that the Government unlawfully used the grand jury process to force him to talk.[6] (Brief of Appellant at 24). We disagree. The record shows that the comment was not responsive to the question asked by the prosecutor and would appear to have been volunteered by the Secret Service agent. From this record we cannot hold that the defendant has sustained his burden of overcoming the presumption of good faith in the prosecution. *See United States v. Bennett*, 539 F.2d 45, 54 (10th Cir.), *cert. denied*, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293; *see also United States v. Woods*, 544 F.2d 242, 250 (6th Cir.), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361, (presumption of regularity attaches to a grand jury proceeding; defendant has burden of proving that an irregularity occurred).

Accordingly we hold that the district court did not err in refusing to dismiss the indictment.

## VI

The defendant also argues that there was insufficient evidence from which the jury could find that he possessed the counterfeit note on or about the date alleged in the indictment—October 27, 1978—or that he possessed it at any time within the five year limitation period for prosecution of such an offense, 18 U.S.C. § 3282, or at any time.[7] He points to the fact that Pruett, the man who received the $10 counterfeit note in question, could not identify the defendant as the person who passed the bill. Defendant also cites the Government expert's admission that defendant's thumbprint could have been present on the note as early as 1900.

Without restating all the evidence detailed in Part I, we note there was testimony by Schmidt, who testified at trial in April 1979, that he had known the defendant about six months; that Schmidt had made a purchase of about $60,000 in counterfeit money in denominations of tens and twenties, received in two deliveries in Octo-

---

5. The alleged inflammatory comment made by the Secret Service agent to the grand jury was: "So, we feel that Mr. Nunez is close enough to the printer that if he wanted to cooperate, he could as it stands now." (I Supp.R. 5).

6. Like his claim that the agent's comment was inflammatory, defendant failed to present this argument in his pretrial motion to dismiss. (I R. 13–14).

7. The indictment was filed January 10, 1979.

ber 1978; that he had had meetings and discussions with the defendant about the money; and defendant and the other two men who carried out the transaction said they had been passing counterfeit money in the four corner States—Colorado, New Mexico, Utah and Arizona—and Kansas and Nebraska and that they said "they pretty well had saturated that area." (II Supp.R. 11). There was also testimony by Agent Haven that the counterfeit $10 bill with defendant's thumbprint on it and the counterfeit bills seized by Agent Haven from Schmidt's vehicle and the shed at his residence were the "same" and were of common manufacture.[8]

The defendant does raise a troublesome issue about the sufficiency of the proof as to the time of defendant's possession of the $10 bill. However, from the direct and circumstantial evidence and reasonable inferences therefrom, considered in the light most favorable to the Government, we conclude that the jury could find beyond a reasonable doubt that the defendant possessed the counterfeit $10 bill at about the time alleged in the indictment, October 27, 1978. We feel that the jury's verdict under the instructions avoids the limitations problem. And since time is not an essential element of the offense charged, any variance here in the evidence from the date alleged in the indictment as to the time of possession may be disregarded, there being no problem of exceeding the limitation period. *See United States v. Allen*, 554 F.2d 398, 408 (10th Cir.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97; *United States v. Davis*, 436 F.2d 679, 682 (10th Cir.); *Whitlock v. United States*, 429 F.2d 942, 945 (10th Cir.).

### VII

We have considered defendant's other appellate contentions and find that they are without merit and require no further discussion. No reversible error has been demonstrated and accordingly the judgment is

AFFIRMED.

---

8. Agent Haven testified that the serial number, the face plate number, the back plate number, the series year, and the Federal Reserve Bank on the bill in question corresponded with the other notes taken from Schmidt, all indicating they were of common manufacture. (II R. 66–67). The "Series" on the face of the counterfeit bill is "1974." (I R. 53).